**James P. DeFAZIO, et al., Plaintiffs,**

v.

**HOLLISTER, INC., et al., Defendants.**

**Nos. CIV. 2:04–1358 WBS GGH, 2:05–0559 WBS GGH, 2:05–1726 WBS GGH.**

United States District Court, E.D. California.

April 6, 2012.

Scottlynn J. Hubbard IV, Kari Hubbard (on the briefs), Law Offices of Lynn Hubbard, Chico, CA, James M. Crawford, Jr., Crawford Law Office, P.A., The Woodlands, TX, Daniel E. Wilcoxen, Wilcoxen Callahan Montgomery and Deacon, Russell Glenn Porter, Martin Niels Jensen, Porter Scott, Sacramento, CA, for Plaintiffs.

James D. Adducci, PHV, Marshall L. Blankenship, PHV, Adducci Dorf Lehner Mitchell and Blankenship, L. Andrew Brehm, PHV, Michael B. Roche, PHV, Schuyler Roche and Zwirner, Mike Bartolic, PHV, William F. Conlon, PHV, Sidley Austin LLP, Chicago, IL, William A. Gould, Jr., Daniel Lawrence Baxter, Wilke Fleury Hoffelt Gould and Birney LLP, Sacramento, CA, for Defendants.

## *MEMORANDUM OF DECISION*

WILLIAM B. SHUBB, District Judge.

After conducting a fifteen-day bench trial and providing the parties with extended time to submit post-trial briefing, the court finds in favor of all defendants on all of plaintiffs' claims under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461. This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### I. *Factual and Procedural Background*

Defendant Hollister, Inc. ("Hollister") is a privately-held Illinois corporation that develops, manufactures, and markets medical devices in the fields of ostomy, continence care, and wound care. Hollister is the wholly-owned and operating subsidiary of defendant The Firm of John Dickinson Schneider ("JDS"). JDS is an Illinois close corporation that holds all of Hollister's capital stock.

John D. Schneider, who only had a high school education and initially began a printing business, founded JDS and devel-

oped Hollister into a prosperous company. Schneider desired for JDS and Hollister to remain independent and employee-owned companies and wanted his employees to share in their success. Schneider accomplished these goals through a direct shareholder program and the Hollister Employee Share Ownership Trust ("HolliShare" or "Plan").

HolliShare is a non-contributory, tax qualified defined contribution profit sharing plan designed to provide retirement benefits to Hollister's non-union employees in the United States. It is governed by a written instrument, the HolliShare Employee Share Ownership Trust ("Plan Instrument"). HolliShare's predominant asset, which totals approximately 95% of its total value, is its JDS common shares. The Plan Instrument mandates that HolliShare's assets be invested in JDS shares to the maximum extent practicable. When initially funded in 1974, HolliShare received 11,950 common shares of JDS that were purchased from shareholders. In exchange, HolliShare assumed the obligation to pay the long-term promissory notes issued to the shareholders to purchase the shares. In late 1974, the Plan transferred 4,007 shares back to JDS along with the related promissory note obligations, leaving the Plan with 7,943 shares. HolliShare has not purchased JDS shares since 1975, but the number of its total shares has increased due to two 100–for–1 stock splits and a 9–for–1 stock dividend.

HolliShare's ownership of JDS shares has proved to be an extraordinary investment, and the annual increases in value of JDS shares according to JDS's valuations exceeded most publicly-traded investments. For example, from 1977 through 2010, the mean average increase in JDS's share price was 26.79% each year, whereas the mean average increase for the Standard & Poors 500 index was 8.8% per year, the mean average increase for the Mid–Cap Index was 14.09% per year, and the mean average increase for the Small–Cap Index was 15.24% per year.

HolliShare participants are neither required nor permitted to contribute to HolliShare. HolliShare primarily raised the liquidity to pay benefits to participants through annual cash contributions from Hollister and cash paid by JDS for the repurchase of the Plan's stock. Hollister is required to contribute 5% of the aggregate compensation of participants to HolliShare each year, but, in recent years, Hollister has contributed between 7.5% to 8.5% of the aggregate compensation, totaling approximately $33 million in contributions since 1990. Because HolliShare invests primarily in JDS common shares, the principal factor that determines the change in value of each HolliShare participant's account is the annual decline or appreciation in the value of the Plan's JDS common shares, and the balance in each participant's account is generally based on the participant's pro-rata percentage of the value of HolliShare. Participants in HolliShare learned about the Plan and its financial condition in annual reports, which were referred to by the parties as and often bore the title of "HolliShare Highlights."

JDS has two classes of shares, preferred [1] and common, neither of which has

---

**1.** HolliShare does not own any preferred shares and all of the preferred shares, which have the controlling interest, were originally owned by Schneider. Schneider placed all of his outstanding preferred shares in the 1977 Preferred Share Trust, which was set to expire in 2001. Upon its expiration, the 1977 Preferred Share Trust provided for the shares to be distributed to the Hollister employees who owned common shares and agreed in writing to abide by Schneider's principles. Instead of allowing the shares to be distribut-

a generally recognized public market. The JDS Articles of Incorporation[2] ("JDS Articles") provide several restrictions on JDS shares relevant to this case. First, under Article Five, only certain persons and entities are entitled to own JDS shares, including holders of shares as of May 5, 1978, select directors and officers of JDS or Hollister, select JDS or Hollister employees, and any deferred benefit plan maintained by JDS and/or Hollister.[3] (Ex. 533, Art. V, ¶ II.C.)

Second, Article Five restricts the manner in which holders of JDS stock may transfer ownership. Specifically, subparagraph II.D.2.a gives JDS a right of first refusal by requiring that any holder of JDS stock who intends to transfer one or more shares must first offer to sell those shares to JDS. Subparagraph II.D.3.b further provides that the price paid for any common share purchased by JDS under its right of first refusal "shall be its book value as of the end of the calendar month in which the Repurchase Date occurs ... computed in accordance with generally accepted accounting principles."[4] (Ex. 531, Art. V, ¶ II.D.3.b.)

The JDS Articles also provide that when JDS repurchases shares pursuant to its right of first refusal, it is obligated to pay only a minimal amount in cash (set originally at $5,000 and then increased to $250,000 in 1999) and can pay the remainder with a promissory note. Not only did HolliShare's cash needs always exceeded the $5,000 and $250,000 minimums, it could not receive a promissory note for its sale of JDS stock because ERISA prohibited it from accepting a promissory note as payment from an employer. *See* 29 U.S.C. § 1106(a)(1)(B).

In addition to the right of first refusal, subparagraph II.D.7.a provides for the sale of JDS shares under "exceptional circumstances":

> Under exceptional circumstances and in the discretion of the Corporation's Board of Directors, shares may be repurchased by the Corporation at such other times, upon such other terms, in such other manners, over such other periods of time, or on such other conditions as the Corporation and the owner

ed, a new trust, the 1999 Preferred Share Trust, was created and, with the consent of the employees who would have received preferred shares upon expiration of the 1977 Preferred Share Trust, the JDS preferred shares were transferred to the 1999 Preferred Share Trust. Although plaintiffs asserted claims based on these trust transactions, the court entered summary judgment in favor of defendants on these claims prior to trial in its June 26, 2009 Order ("June 2009 Order"). *See DeFazio v. Hollister, Inc.*, 636 F.Supp.2d 1045, 1052–54, 1072–77 (E.D.Cal.2009).

**2.** The JDS Articles were amended multiple times between 1978 and 1999. (*See* Exs. 531–36.) Unless otherwise noted, the cited paragraphs of JDS Articles are common to all of the versions.

**3.** Subparagraph II.C was amended in 1984 to allow a non-employee director or officer of JDS or Hollister, such as defendant Richard

T. Zwirner, to own stock if the individual had "performed substantial and continuing services" for JDS or Hollister. The JDS Articles were amended again in 1999 to allow The 1999 Preferred Share Trust to hold shares.

**4.** As noted in an earlier Order, "book value" refers to a method used to value corporate stock, but the term has no generally accepted definition. *DeFazio v. Hollister Emp. Share Ownership Trust*, 406 F.Supp.2d 1085, 1087 n. 2 (E.D.Cal.2005) (Karlton, J.) (citing 51 A.L.R.2d 606 § 2). "[T]he term contemplates a theoretical value resulting from depreciation or appreciation as computed upon an originally determined base." *Id.* Albeit a simplified explanation, book value is generally calculated by subtracting a company's liabilities from its assets.

or holder of such shares may from time to time agree.

(Ex. 531, Art. V, ¶ II.D.7.a.)

The Plan Instrument permits the sale of the Plan's JDS stock and does not set the price for such sales but requires that the sales be conducted in accordance with the JDS Articles. (Ex. 9–9.14, § 11.01(2).) Defendants testified at trial that, since the mid–1980s, HolliShare has sold its holdings of JDS common shares to JDS pursuant to the "exceptional circumstances" provision of subparagraph II.D.7.a, not the right of first refusal embodied in subparagraph II.D.2.a. Defendants testified that HolliShare and JDS entered into an agreement in the mid–1980s ("mid–80s agreement")[5] that has since governed JDS's repurchases of common shares from HolliShare. Neither the mid–80s agreement nor its terms were memorialized in writing. Defendants testified that the terms of the agreement were that HolliShare would provide advance projections of the Plan's cash needs, HolliShare would sell shares back to JDS once a year, the purchase price would be the audited book value from December 31 of the prior year, JDS would purchase all of the shares HolliShare sought to sell, and JDS would pay all cash for the shares.

Although the theories underlying plaintiffs' claims have evolved as this case has progressed, the heart of plaintiffs' case at trial was that the price JDS paid for HolliShare's sales of its JDS stock should have been 1) the current month-end book value from the month in which the sale took place ("month-end book value"); or 2) a price determined to be the fair market value of the shares. Plaintiffs contend that, by selling at the December 31 book value from the year prior to the sale ("December 31 book value") instead of the month-end book value or the fair market value, the HolliShare fiduciaries breached their duties under ERISA and caused the Plan to suffer extraordinary losses.

The parties have stipulated as to a variety of details concerning the challenged transactions, including the sale date, the December 31 book value that was used for the sale price, the number of shares sold, and, for almost all of the sales, the month-end book value for the month in which the challenged transactions occurred. (See Docket No. 630 ("Stipulation of Facts").) Between 1981 and 2007, HolliShare sold its shares to JDS on nineteen occasions. The years in which sales took place, the number of shares sold, and the cash proceeds generated were as follows: 1981 (69,300 shares for $997,227.00); 1982 (38,000 shares for $723,140.00); 1985 (20,000 shares for $1,368,400.00); 1986 (180,000 shares for $12,619,800.00); 1987 (100,000 shares for $9,756,000.00); 1993 (75,000 shares for $25,830,000.00); 1995 (30,000 shares for $14,697,300.00); 1996 (166,973 shares for $10,000,012.97); 1997 (135,000 shares for $9,863,100.00); 1998 (250,000 shares for $21,262,500.00); 1999 (200,000 shares for $21,332,000.00); 2000 (150,000 shares for $18,679,500.00); 2001 (220,000 shares for $29,590,000.00); 2002 (46,250 shares for $7,174,300.00); 2003 (44,750 shares for $8,490,417.50); 2004 (50,000 shares for $11,908,000.00); 2005 (22,000 shares for $6,335,120.00); 2006 (26,500 shares for $8,717,400.00); and 2007 (85,500 shares for $34,006,770.00). (Id. ¶¶ 28–46.)

## A. The Parties

### 1. Plaintiffs

With the exception of plaintiff James P. DeFazio, all of the plaintiffs in this case are former employees of Hollister and former participants in HolliShare. The for-

---

**5.** As this litigation progressed, counsel referred to this agreement as the "mid–80s agreement," (Tr. 862:16–21), and the court will refer to it as such in this Order as well.

mer HolliShare participant plaintiffs and the years in which they ended their Hollister employment and received the distribution of their HolliShare accounts include: DeLane Humphries (1998); Brenda Dimaro (1999); Judy Seay (1999); Hallie Lavick (2000); Michael McNair (2002); Nancy Russell Stanton (2002); Sonya Pace (2003); Kathleen Ellis (2004); Theresa Beetham (2006); and Cindy Worth (2006). All of these plaintiffs had terminated their employment and received lump sum distributions of their HolliShare accounts before commencing or joining this action. James P. DeFazio is Ellis's former husband and is an alternate payee on an account created with funds from Ellis's HolliShare distribution.

In a fourteen-month period between 2004 and 2005, three subsets of the current plaintiffs independently filed complaints against Hollister, JDS, the HolliShare Trustees, and various members of the boards of directors of both companies.[6] The cases were consolidated by court order on May 25, 2006. (Docket No. 87.) All of the plaintiffs except Ellis ("DeFazio/Dimaro plaintiffs") are represented by the same counsel and filed their Fifth Amended Complaint on July 22, 2008. (Docket No. 368.) Ellis, the only plaintiff represented by separate counsel, filed her Fourth Amended Complaint on January 23, 2008.[7] (Docket No. 314.) The allegations asserted against defendants are substantially similar in both operative complaints, and counsel for the DeFazio/Dimaro plaintiffs and Ellis tried the case together, with Ellis's counsel taking the lead at trial and in the post-trial briefing.

### 2. Defendants

#### a. HolliShare Trustee Defendants

Defendant Richard T. Zwirner has performed legal work for Hollister and JDS since 1969, and he has been a HolliShare Trustee since 1976. He has also provided consulting services to Hollister since the late 1970s and served as the Corporate Secretary of JDS from 1974 to 1981, a Director of JDS and Hollister since 1978, Hollister's Vice President of Marketing and Sales from 1991 to 1994, and General Counsel to Hollister since 1977.

Hollister's chief financial officers also served as HolliShare Trustees, which, in succession, were defendants Charles H. Gunderson,[8] James J. McCormack, and Samuel P. Brilliant. McCormack served as a HolliShare Trustee from 1989 to June 2000 and was also Hollister's Treasurer and Chief Financial Officer from 1981 to 2000, Vice President of Finance from 1981 to 1993, and a Senior Vice President from

---

6. This case was not brought as a class action on behalf of all past or current members of HolliShare. The DeFazio/Dimaro plaintiffs included class allegations in their Fourth and Fifth Amended Complaints, but then filed a statement of non-opposition to defendants' motion to strike those allegations, (Docket No. 533), and thus the court granted defendants' motion to strike the class allegations. *DeFazio*, 636 F.Supp.2d at 1055–56.

Plaintiffs also named HolliShare as a defendant, but have never treated it as a defendant and did not propose findings of fact or conclusions of law addressing its liability. Thus the court will enter judgment in favor of HolliShare.

7. As used in this Order, the term "plaintiffs" refers collectively to all eleven plaintiffs unless otherwise noted.

8. Although plaintiffs indicate in their proposed findings of fact that Gunderson was a Trustee before McCormack (Docket No. 647 at 13:20–21), the only testimony at trial was that Gunderson was the "vice president and treasurer of the corporation" prior to his termination. (Tr. 245:5–8.) More importantly, the court dismissed Gunderson as a defendant in this action in the June 2009 Order. *See DeFazio*, 636 F.Supp.2d at 1059, 1080.

1993 to 2000. Brilliant became a HolliShare Trustee in July of 2000 and was still a Trustee at the time of trial. Brilliant also served as Hollister's Vice President of Finance and Treasurer from October 1998 to July 2000 and became its Chief Financial Officer and a Vice President of Hollister in 2000.

Hollister's heads of the human resources department also served as HolliShare Trustees, which, in succession, were defendants Charles C. Schellentrager, James A. Karlovsky, and Lori Kelleher. Although it is unclear from the testimony at trial when Schellentrager became a Trustee, his term ended in 1990 at the latest when Karlovsky succeeded him. Karlovsky served as a Trustee from 1990 to July 2004 and also served as Hollister's Vice President of Human Resources from 1989 to 2003 and Executive Assistant to the President from 2003 to 2004. Kelleher succeeded Karlovsky as a Trustee in 2004 and continued to serve as a Trustee until 2011.

Defendant Loretta A. Stempinski also served as a HolliShare Trustee from 1980 to 2001, held various positions in Hollister from 1961 to 1980, and served as a Director of JDS and Hollister from 1980 to 2001.[9] Ellis has not asserted claims against Stempinski.

### b. *Non–Trustee Defendants*

Defendant Michael C. Winn served as a Director of JDS and Hollister from 1979 to May 2001 and as Hollister's Vice President of Legal Affairs from 1974 to 1977, President from 1977 to 2001, and Chairman and CEO from 1981 until 2001. Ellis has not asserted claims against Winn. Defendant Alan F. Herbert served on the Boards of Directors of Hollister and JDS from 1998 to May 2011 and also served as Hollister's President and Chief Operating Officer from 1997 to 2001, President from 2001 to 2007, and Chairman and CEO from 2007 until 2011.

Plaintiffs also named Donald J. Groneberg, Richard I. Fremgen, and Donna J. Matson as defendants. The only testimony about Groneberg at trial was that he was a member of the finance department at Hollister. (Tr. 2153:21–2154:2, 2374:24–2375:1.) Plaintiffs did not offer evidence at trial establishing that Groneberg owed fiduciary duties to the HolliShare beneficiaries and have not proposed findings of fact or conclusions of law addressing his liability. Similarly, while there was limited testimony about Fremgen being on the Hollister Board of Directors (Tr. 315:14–316:5, 1546:25–1547:4) and defendants have indicated that he was on the board from 1999 until 2010, there was no testimony about his conduct at trial and plaintiffs did not propose any findings of fact or conclusions of law with respect to claims against him. Lastly, based on two passing references to her at trial, it appears Matson may have been a HolliShare Trustee. (*See* Tr. 306, 1913.) While the clerk's office has not terminated her as a defendant in this action, it appears she was dismissed in an early order in this case and neither party appears to believe claims are still pending against her. The court will therefore enter judgment in favor of Groneberg, Fremgen, and Matson.

### B. *Plaintiffs' Claims*

Because plaintiffs failed to sufficiently identify their claims remaining for trial in their pretrial statement, the Final Pretrial Order required plaintiffs to file "an amended statement of the remaining claims that identifies, for each claim, 1) the statutory

---

**9.** Defendants contend that plaintiffs did not adduce any evidence at trial with respect to Stempinski. However, Winn testified that she was a HolliShare Trustee and a Hollister and JDS board member. (Tr. 46:4–11, 62:11–14, 117:7–11.)

or common law basis for the claim; 2) the elements plaintiff must prove in order to prevail on the claim; 3) the plaintiff or plaintiffs asserting the claim; and 4) the defendant or defendants that the claim is asserted against." (Docket No. 583 at 3:23–28.) In their amended statement, plaintiffs identified twelve ERISA claims under various subsections of 29 U.S.C. §§ 1103–1106, 1110, 1140, and 1056. (Docket No. 588.)

## II. *Analysis*

### A. *Statutory Standing*

ERISA provides for a civil action to be brought only by the Secretary of Labor, a participant, a beneficiary,[10] or a fiduciary. 29 U.S.C. § 1132. In the context of ERISA, a "participant" means "any employee or former employee of an employer . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer." *Id.* § 1002(7). "The Supreme Court has interpreted this section as conferring standing on former employees who 'have a reasonable expectation of returning to covered employment or . . . a colorable claim to vested benefits.'" *Vaughn v. Bay Envtl. Mgmt., Inc.*, 567 F.3d 1021, 1025 (9th Cir.2009) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)).

Relying on *Kuntz v. Reese*, 785 F.2d 1410, 1411 (9th Cir.1986), defendants have repeatedly argued during the course of this litigation that plaintiffs lack statutory standing under ERISA because, as retirees who have withdrawn their full account balances, they no longer have a colorable claim to vested benefits and thus are not "participants." In 2006, however, Judge Karlton rejected defendants' argument, concluding that the Ninth Circuit has "allowed suit even when plaintiffs have received their vested benefits if they allege that fiduciaries 'personally profited' from a breach of their duty of loyalty to the plan." *Ellis v. Hollister, Inc.*, Civ. 05–559 LKK GGH, 2006 WL 988529, at *4 (E.D.Cal. Apr. 14, 2006) (citing *Amalgamated Clothing & Textile Workers Union, AFL–CIO v. Murdock*, 861 F.2d 1406, 1418 (9th Cir. 1988)). Defendants requested this court to reconsider Judge Karlton's ruling in 2007, and the court declined to do so because the ruling was not clearly erroneous. *See DeFazio v. Hollister, Inc.*, Civ. No. 04–1358 WBS GGH, 2007 WL 3231670, at *3–4 (E.D.Cal. Nov. 1, 2007). The court again declines defendants' suggestion that the court should depart from Judge Karlton's 2006 decision.

Moreover, the Ninth Circuit has more recently distinguished *Kuntz* and held that a "former employee who has received a full distribution of his or her account balance under a defined contribution pension plan has standing as a plan participant to file suit under [ERISA] to recover losses occasioned by a breach of fiduciary duty that allegedly reduced the amount of his or her benefits." *Vaughn*, 567 F.3d at 1023, 1025–26; *accord Harris v. Amgen, Inc.*, 573 F.3d 728, 733 (9th Cir.2009). In *Vaughn*, the Ninth Circuit did not require that the trustees had personally profited from their breaches in order for the participants to have standing, which Judge Karlton had previously found would be required under the pre-*Vaughn* precedent.[11]

---

10. Defendants concede that, as an "alternate payee," DeFazio is deemed to be a "beneficiary" under 29 U.S.C. § 1056(d)(3)(J). (Docket No. 658 at 20 n. 8.)

11. Whether the Trustees personally profited as a result of their breaches would be relevant if plaintiffs were seeking a constructive trust on any ill-gotten profits. *See Amalgamated Clothing & Textile Workers Union, AFL–CIO,*

B. *Statute of Limitations*

1. *"Fraud or Concealment" Exception*

 ERISA's statute of limitations provides:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

*except that in the case of fraud or concealment,* such action may be commenced not later than six years after the *date of discovery of such breach or violation.*

29 U.S.C. § 1113 (emphasis added). While § 1113 requires a plaintiff to file a claim within six years of the date of the last act constituting a part of the alleged violation, regardless of when the plaintiff actually learned of the violation, the " 'fraud or concealment' exception tolls the running of the limitations period for six years from the date of discovery." *Barker v. Am. Mobil Power Corp.,* 64 F.3d 1397, 1401 (9th Cir.1995). "Plaintiffs bear the burden of proving 'fraud or concealment' under 29 U.S.C. § 1113." *Harris v. Koenig,* 815 F.Supp.2d 12, 20 (D.D.C.2011); *accord Barker,* 64 F.3d at 1401 (finding the "fraud or concealment" exception inapplicable "because the plaintiffs have not produced specific evidence of fraudulent activity or concealment" by defendants).

 Here, plaintiffs rely on the "fraud or concealment" exception to assert claims based on defendants' alleged breaches of fiduciary duties beginning in 1982. The "fraud or concealment" exception applies only when an ERISA fiduciary either "made knowingly false misrepresentations with the intent to defraud the plaintiffs" or took "affirmative steps . . . to conceal any alleged fiduciary breaches." *Barker,* 64 F.3d at 1401; *accord Radiology Ctr., S.C. v. Stifel, Nicolaus & Co.,* 919 F.2d 1216, 1220 (7th Cir.1990) ("An ERISA fiduciary can delay a wronged beneficiary's discovery of his claim [meriting application of the 'fraud or concealment' exception] either by misrepresenting the significance of facts the beneficiary is aware of (fraud) or by hiding facts so that the beneficiary never becomes aware of them (concealment).").

 Courts have recognized that the "fraud or concealment" exception to § 1113 incorporates the common law doctrine of fraudulent concealment. *Barker,* 64 F.3d at 1402. Under that common law doctrine, passive concealment alone may toll the statute of limitations if the defendant has a duty to disclose material information. *Thorman v. Am. Seafoods Co.,* 421 F.3d 1090, 1092 (9th Cir.2005). Courts that have considered the issue, however, have held that the doctrine of passive concealment does not apply to § 1113. *See, e.g., Ranke v. Sanofi–Synthelabo Inc.,* 436 F.3d 197, 204 (3d Cir.2006) (stating that an ERISA fiduciary must "have taken affirmative steps to hide an alleged breach of fiduciary duty from a beneficiary in order for the 'fraud or concealment' exception to apply"); *Larson v. Northrop Corp.,* 21

861 F.2d at 1414 ("[T]he imposition of a constructive trust on a fiduciary's ill-gotten profits in favor of all plan participants and beneficiaries is an important, appropriate, and available form of relief under ERISA § 409(a).") Plaintiffs have not, however, sought such a remedy. (*See* Docket Nos. 650–53, 662.)

F.3d 1164, 1174 (D.C.Cir.1994) ("While a fiduciary's mere silence could, in some circumstances, amount to fraud, it would still fall short of the fraudulent concealment that courts have required for purposes of § 1113."); *Schaefer v. Ark. Med. Soc'y*, 853 F.2d 1487, 1491 (8th Cir.1988) (holding that active concealment under § 1113 requires "more than merely a failure to disclose").

The Ninth Circuit in *Barker* implicitly found passive concealment insufficient to toll the statute of limitations. There, the Ninth Circuit recognized that an ERISA fiduciary generally has a duty to disclose "complete and accurate information material to the beneficiary's circumstances," but focused only on whether the defendants had affirmatively concealed their breach when holding that the defendants did not engage in "fraud or concealment" under § 1113. *See Barker*, 64 F.3d at 1401, 1403. An ERISA fiduciary's mere failure to disclose material information thus does not merit tolling under § 1113.

■ The "fraud or concealment" exception tolls the statute of limitations only "until the plaintiff in the exercise of reasonable diligence discovered or should have discovered the alleged fraud or concealment." *J. Geils Band Emp. Ben. Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1252 (1st Cir.1996) (citing *Larson*, 21 F.3d at 1172–74).[12] Defendants first argue

that plaintiffs cannot rely on the "fraud or concealment" exception because none of the plaintiffs testified at trial or submitted evidence establishing that they exercised reasonable diligence.

When addressing a similar tolling provision in the statute of limitations for federal securities fraud claims (28 U.S.C. § 1658(b)), however, the Supreme Court held that "the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' ... *irrespective of whether the actual plaintiff undertook a reasonably diligent investigation.*" *Merck & Co., Inc. v. Reynolds*, —— U.S. ——, ——, 130 S.Ct. 1784, 1798, 176 L.Ed.2d 582 (2010) (emphasis added). The Court's holding applies equally to § 1113, especially because the Court's analysis in *Merck* is centered around concepts embodied in the general "discovery rule." *See id.* at 1793–98. Holding otherwise could fault plaintiffs for failing to exercise reasonable diligence even when the exercise of reasonable diligence would not have alerted them to their claims because the defendants had concealed their misconduct. Therefore, assuming plaintiffs in this case were not reasonably diligent, they would be precluded from relying on the "fraud or concealment" exception only if a reasonably diligent plaintiff would have discovered the misconduct.[13]

---

12. In cases of active concealment, some courts have held that a plaintiff can rely on the "fraud or concealment" exception even in the absence of diligence by the plaintiff. *See J. Geils Band Emp. Ben. Plan*, 76 F.3d at 1254 n. 10; *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1096 n. 19 (7th Cir.1992).

13. When addressing tolling in the context of federal securities fraud claims, the Supreme Court "held that the ultimate burden is on the defendant to demonstrate that a reasonably diligent plaintiff would have discovered the facts constituting the violation." *Strategic Di-*

*versity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1206 (9th Cir.2012) (discussing *Merck & Co.*, 130 S.Ct. at 1798). In contrast, the First Circuit held that, for tolling under § 1113, the plaintiff has the burden of showing reasonable diligence unless the plaintiff alleges that the statute is tolled based on the defendant's self-concealing wrong. *J. Geils Band Emp. Ben. Plan*, 76 F.3d at 1259; *see also Truck Drivers & Helpers Union, Local No. 170 v. N.L.R.B.*, 993 F.2d 990, 996 (1st Cir.1993) ("[A] plaintiff may establish a self-concealing wrong by demonstrating that the defendant

## 2. HolliShare Highlights

Plaintiffs contend that defendants concealed the sales price of HolliShare's JDS shares in the HolliShare Highlights, which were the annual reports distributed to participants to inform them about HolliShare's funding and financial condition.[14] In the June 2009 Order, this court held that, based on language in the HolliShare Highlights, a participant could have reasonably believed that HolliShare's shares of JDS stock were sold to JDS at the month-end book value from the month in which a sale occurred. *DeFazio*, 636 F.Supp.2d at 1061. Specifically, from 1993 to 2000, the HolliShare Highlights informed participants of the following:

> JDS common shares, which are valued at their book value, are not publicly traded. They are for all practical purposes not transferable to any person or entity other than JDS itself. They are subject to severe transfer restrictions which require that the Trust first offer them to JDS, the parent company of Hollister Incorporated, at their book value.

To date, JDS has repurchased common shares from the Trust at their book value to provide the plan with the needed cash.

(Exs. 4–4.18 at 7, 4–4.19 at 7, 4–4.20 at 7, 4–4.21 at 7, 4–4.22 at 7, 4–4.23 at 7, 4–4.24 at 7, 4–4.25 at 7.)[15] Based on this information, a reasonable participant could have believed that HolliShare sold its holdings of JDS common shares pursuant to the sale price specified for sales made pursuant to the "right of first refusal" in subparagraph II.D.2.a of Article 5 of the JDS Articles.

Specifically, subparagraph II.D.2.a provides:

> If any . . . trust . . . desires or intends to transfer any one or more shares of the Corporation, . . . such holder shall first offer in writing, . . . to sell to the Corporation all shares of the Corporation which such holder desires or intends to

'engage[d] in some misleading, deceptive or otherwise contrived action or scheme, *in the course of committing the wrong,* that is designed to mask the existence of a cause of action.' " (quoting *Hobson v. Wilson,* 737 F.2d 1, 34–35 (D.C.Cir.1984) (alteration in original))).

The parties have not addressed which party has the burden to establish either the existence or absence of reasonable diligence. Nonetheless, because the court finds that the exercise of diligence would not have uncovered the alleged breaches, the court's conclusion about reasonable diligence would be the same regardless of which party had the burden on that issue.

**14.** The Ninth Circuit has held that the "fraud or concealment" exception applies "only when the defendant himself has taken steps to hide his breach of fiduciary duty." *Barker,* 64 F.3d at 1402. As a result, "[p]laintiffs may not generally use the fraudulent concealment by one defendant as a means to toll the statute of limitations against other defendants." *Id.* (quoting *Griffin v. McNiff,* 744 F.Supp. 1237, 1256 n. 20 (S.D.N.Y.1990), *aff'd,* 996 F.2d 303

(2d Cir.1993)) (internal quotation marks omitted). The testimony from at least some of the Trustees in this case was that they read and reviewed the HolliShare Highlights before they were distributed to the participants. (*See* Tr. 371:14–16, 372:9–12 (Karlovsky), 2452:16–23 (Zwirner).) From this testimony—and in light of the fact that defendants have not argued that any of the Trustees did not read or review the HolliShare Highlights—the court finds that each Trustee approved the HolliShare Highlights and is responsible for the information provided to the beneficiaries in them.

**15.** Beginning in 1998 and continuing through 2000, the following underscored language was omitted: "They are subject to severe transfer restrictions which require that the Trust first offer them to JDS, *the parent company of Hollister Incorporated,* at their book value." (*See* Exs. 4.4–23 at 7, 4.4–24 at 7, 4–4.25 at 7 (emphasis added).) This omission does not affect the court's analysis.

transfer ... at the price and in the manner set forth in subparagraphs 3 and 4 of this paragraph D.

(Ex. 531, Art. V, ¶ II.D.2.a.) Subparagraph II.D.3.b of Article Five then mandates that, for sales pursuant to the right of first refusal, "[t]he price of each common share shall be its book value as of the end of the calendar month in which the Repurchase Date occurs...." (*Id.* Art. V, ¶ II.D.3.b.) When the explanation in the HolliShare Highlights that the transfer restrictions on its JDS shares "require that the Trust first offer them to JDS ... at their book value" is read in conjunction with the right of first refusal in the JDS Articles, a participant could reasonably conclude that the shares were sold at the month-end book value dictated in subparagraph II.D.3.b.

Defendants argue, however, that a reasonable beneficiary would not draw this conclusion because the JDS Articles also provide for JDS to pay the purchase price for sales pursuant to the right of first refusal with a limited amount of cash and the remainder in a subordinated promissory note. (*See id.* Art. 5, ¶ II.D.4.a.) In contrast to this provision, they point out that HolliShare always received payment for its shares from JDS in cash, suggesting that the sales were not conducted under the terms of the right of first refusal. In the HolliShare Highlights, however, beneficiaries were told that "JDS has repurchased common shares from the Trust at their book value to provide the plan with the needed cash." Although this suggests that payments may have been in cash, it does not preclude the possibility that HolliShare received a promissory note, especially because a promissory note could have been sold to a bank to obtain cash.

(*See* Tr. 663:10–664:2.) That HolliShare's receipt of cash only payments for its JDS stock is inconsistent with the terms of payment for a sale conducted pursuant to the right of first refusal would therefore not prevent a reasonable participant from concluding that HolliShare's sales were conducted under the terms and at the price provided for in the right of first refusal provision.

Before 1993, however, the HolliShare Highlights did not contain similar language suggesting that HolliShare's sales of its JDS stock were pursuant to and according to the terms of the right of first refusal. Specifically, from 1983 to 1992, the HolliShare Highlights stated:

> JDS common shares, which are valued at their book value, are not publicly traded. They are subject to severe transfer restrictions and can only be sold to JDS, the parent company of Hollister Incorporated.

> To date, JDS has repurchased common shares from the Trust at their book value to provide the plan with needed cash.

(Exs. 4–4.8 at 9, 4–4.9 at 10, 4–4.10 at 10, 4–4.11 at 6, 4–4.12 at 6, 4–4.13 at 7, 4–4.14 at 7, 4–4.15 at 7, 4–4.16 at 7, 4–4.17 at 7.).[16] Similarly, the 1982 HolliShare Highlights explained:

> In evaluating these comparisons, it must be recognized that JDS common shares, which are valued at their book value, are not publicly traded and are subject to very severe transfer restrictions. As a practical matter, they can only be sold to JDS, the parent company of Hollister Incorporated.

---

**16.** From 1983 to 1987, the first sentence of the explanation varied slightly. (*See* Exs. 4–4.8 at 9, 4–4.9 at 10, 4–4.10 at 10 ("As you evaluate these comparisons, remember that JDS common shares, which are valued at their book value, are not publicly traded."); Exs. 4–4.11 at 6, 4–4.12 at 6 ("Remember that JDS common shares, which are valued at their book value, are not publicly traded.").)

To date, JDS has repurchased common shares from the Trust at their book value in order to provide the Trust with needed cash.

(Ex. 4–4.7 at 7.)

The explanations from 1982 to 1992 are silent with respect to whether "book value" refers to the December 31 book value or month-end book value and lack any language suggesting one or the other. Based on the explanations, it is equally plausible that HolliShare sold its shares under the exceptional circumstances provision. At most, the HolliShare Highlights from 1982 to 1992 omit arguably material information, which is insufficient to trigger the "fraud or concealment" exception. Plaintiffs have not satisfied the court that defendants committed any other affirmative acts of concealment during that ten-year period that would have led a reasonable participant to believe that HolliShare's sales of its JDS stock were at the month-end book value.

Accordingly, because plaintiffs are unable to rely on the "fraud or concealment" exception for any alleged misconduct between 1982 to 1992, their claims based on HolliShare's sale of JDS stock from 1982 to 1992 are time barred and the court will enter judgment in favor of defendants on those claims.[17] Further, because Schellentrager's tenure as trustee ended when Karlovsky replaced him in 1990, (Tr. 345:1–5), the entirety of plaintiffs' claims against him are untimely and the court will enter judgment in his favor.

Returning to plaintiffs' claims based on HolliShare's sale of JDS stock beginning in 1993, defendants further contend that the following language in the Plan Instrument disclosed the use of the December 31 book value:

The assets in the Trust Fund shall be valued by the Trustees at their respective fair market values as of each December 31st. The fair market value of Common Shares of JDS Inc. held in the Trust Fund shall, subject to the provisions of the remainder of this Section 7.03, be their book value as of the valuation date as reflected on the books of JDS Inc. The Trustees shall accept such book value as the fair market value if such book value is computed in accordance with generally accepted accounting principles.

(Ex. 501 § 7.03.)[18] Article VII of the Plan Instrument, which this explanation is a part of, however, is titled "Accounts and Allocations of Funds" and addresses valuing each participant's account in detail, not valuing JDS stock for the purpose of a sale.

Because the first sentence addresses the "assets in the Trust Fund" more broadly, the reference to the December 31 value in that sentence could be interpreted as referring to the valuation of all assets in the trust for purposes of determining the value of each participant's account. This is consistent with the use of December 31 as the date of evaluation for participant's accounts regardless of when they retire in the following year. On the other hand, the second sentence, which specifically refers

---

17. If the court's finding that plaintiffs' claims based on defendants' conduct from 1982 to 1992 is reversed for any reason, the remainder of the court's analysis in this Order of plaintiffs' post–1992 claims would apply equally to their time-barred claims.

18. The explanation was also included in the letter sent to DeFazio, which is discussed below. (Ex. 176.) Although defendants have not relied on this evidence, all of the HolliShare Highlights before the court also included substantially similar language in the endnotes following the breakdown of HolliShare's financial information.

to the "fair market value of Common Shares of JDS Inc.," omits any reference to December 31 and states that the value shall be "their book value as of the *valuation date*." Based on the use of "valuation date" in that sentence, a participant could reasonably conclude that the book value of JDS stock would vary depending on when the valuation and sale occurred and thus would not remain stagnant for the entire year at the December 31 book value. Although the correct interpretation of this explanation is not clear, a reasonable participant could still believe that HolliShare's sales of JDS stock were set at the right of first refusal price of month-end book value and that only the accounts were valued annually as of December 31.

Plaintiffs have thus persuaded the court that the potential inconsistency between HolliShare's receipt of cash payments and the provision for a promissory note in the right of first refusal and the disclosure setting the valuation date for HolliShare accounts at December 31 did not amount to "storm warnings" putting the plaintiffs on notice about defendants' alleged breaches. Even assuming these inconsistencies would have alerted a reasonably diligent participant to defendants' alleged breaches, the most a reasonable participant could be expected to do in receipt of potentially conflicting information would be to inquire further about the terms of the sales. While the court doubts that a reasonably diligent participant would have done more than review the annual HolliShare Highlights, the court finds that even additional efforts would not have led a participant to discover the alleged misconduct.

For example, a reasonably diligent participant might have inquired about the details pertaining to the Plan's sale of JDS stock. In this case, however, DeFazio made such an inquiry. In a letter dated November 3, 1997, he was told that, since 1973, "every transfer by JDS Inc[.] has been at book value; and JDS Inc[.] has always exercised its right of first refusal and repurchased such shares at book value." (Ex. 176 at 3.) As previously discussed, the express reference to the "right of first refusal" in this letter when read in conjunction with the JDS Articles indicates that the price for the JDS stock would have been the "book value as of the end of the calendar month in which the Repurchase Date occurs." (Ex. 531.)

Additionally, if plaintiffs had pursued an investigation beyond inquiring from Hollister or HolliShare, the evidence suggests they would not have discovered the precise terms of HolliShare's sales of JDS stock. In response to a Department of Labor investigator's request for documents evidencing HolliShare's sales of its shares to JDS, (Ex. 54 at 8), HolliShare indicated sales prices for sales from 1994 to 1998 that were the December 31 book value, but also indicated that each of the sales took place on January 1, (*id.* at 10). From the information provided to the Department of Labor and available to the participants, it would be unlikely that a reasonably diligent participant would have known that the sales in 1994 to 1998 actually took place in March of each year, with a sales price that is allegedly three months, not one day, "old."

The court also doubts that additional efforts or inquiries by plaintiffs could have unveiled the dynamics and purported terms of the Plan's sales of JDS stock because even defendants' counsel seemed unaware of the terms of such sales for at least the first three years of this litigation. In a memorandum in support of their motion to dismiss plaintiffs' First Amended Complaint filed in October 2006, counsel for seven of the defendants stated, "It cannot seriously be argued that a routine

and commonplace sale by HolliShare of JDS common shares involves any 'extraordinary circumstances.' " (Docket No. 148 at 11:15–17.) A year later, the same counsel again explained that sales could not have been pursuant to the "exceptional circumstances" provision. (*See* Docket No. 282 at 12:3–6 ("Plaintiffs do not suggest what 'exceptional circumstances' exist that would—or even may—justify a decision by the JDS Board to treat HolliShare's periodic offers to sell some of its JDS common shares differently from offers to sell made by all other JDS shareholders.").) If it was unclear to at least some of defendants' counsel that the sales were pursuant to the exceptional circumstances provision, it would be unreasonable to conclude that a reasonably diligent participant would have discovered that fact about HolliShare's sales of JDS stock.

■ Accordingly, the court finds that a reasonably diligent participant would not have discovered the alleged misconduct at issue in this case before the plaintiffs in this case did and therefore any lack of diligence or inquiry by plaintiffs does not preclude them from relying on the "fraud or concealment" exception. Because § 1113 tolls the statute of limitations to six years after the discovery date and the true sales prices and terms were not revealed until after this case was filed, plaintiffs' ERISA claims beginning in 1993 and continuing through 2011 are timely.

### C. Sales of JDS Shares at December 31 Book Value

#### 1. Breach of Fiduciary Duties

##### a. Prohibited Transactions under ERISA

■ ERISA establishes a blanket prohibition on certain transactions that "entail a high potential for abuse," including the sale or exchange of property between an ERISA plan and a "party in interest." *Donovan v. Cunningham,* 716 F.2d 1455, 1465 (5th Cir.1983) (discussing 29 U.S.C. § 1106(a)(1)). As used in § 1106(a)(1), a "party in interest" includes the employer of the employees covered by the ERISA plan in question. 29 U.S.C. § 1002(14).

Nevertheless, ERISA provides an exemption for prohibited transactions that meet certain requirements, and § 1108(e) allows the sale or acquisition by a plan of employer stock if three criteria are met:

> (1) if such acquisition, sale, or lease is for adequate consideration (or in the case of a marketable obligation, at a price not less favorable to the plan than the price determined under section 1107(e)(1) of this title), (2) if no commission is charged with respect thereto, and (3) if—(A) the plan is an eligible individual account plan (as defined in section 1107(d)(3) of this title)....

*Id.* § 1108(e). The parties stipulated that HolliShare is an eligible individual account plan under ERISA, (Stipulation of Facts ¶ 26), and plaintiffs have not alleged that a commission was charged. Therefore, the only dispute at trial to determine whether HolliShare's sales of JDS stock to JDS came within the exception in § 1108(e) was whether the sales were for "adequate consideration."

When a security has no generally recognized market, the term "adequate consideration" means "the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]." 29 U.S.C. § 1002(18); *see also* 29 C.F.R. § 2550.408e (cross-referencing § 1002(18) in defining "adequate consideration" for purposes of § 1108(e)). The Secretary of Labor has yet to promul-

gate regulations guiding a trustee's determination of fair market value.[19]

In addition to prohibiting certain transactions, ERISA also imposes on fiduciaries the "highest" duties known to law. *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir.1996). Specifically, § 1104(a)(1) requires an ERISA fiduciary to "act for the exclusive benefit of plan beneficiaries" and § 1104(a)(1)(B) requires the fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* (quoting § 1104(a)(1)(B)) (internal quotation marks omitted). When an ERISA plan transacts in employer securities, its fiduciaries thus bear the "heavy" burden of showing that the transaction satisfies the requirements of § 1108(e) and that the fiduciaries fulfilled their duties of loyalty and care under § 1104(a)(1) and (a)(1)(B). *See id.*

■ Whether a particular transaction with an interested party complies with §§ 1104(a)(1), (a)(1)(B), and 1108(e) depends upon the conduct of the fiduciaries. *See id.* (citing *Cunningham*, 716 F.2d at 1467–68). Fiduciaries "are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options." *Id.* at 1488–89; *see Cosgrove v. Circle K Corp.*, 915 F.Supp. 1050, 1064 (D.Ariz.1995) ("Good faith requires that the trustees of the Plan have used a prudent method of determining value."), *aff'd*, 107 F.3d 877 (9th Cir.1997). The precise scope and nature of the required investigation depends upon the circumstances surrounding the transaction and the asset. *See Keach v. U.S. Trust Co.*, 419 F.3d 626, 637 (7th Cir.2005) (evaluating the sufficiency of the fiduciary's investigation "within the context of the totality of the circumstances"); *Cunningham*, 716 F.2d at 1467–68 (noting that fiduciaries may satisfy their burden by showing they

---

**19.** In 1988, the Department of Labor proposed a regulation that elaborated on the definition of "adequate consideration." It states:

First, the value assigned to an asset must reflect its fair market value.... Second, the value assigned to an asset must be the product of a determination made by the fiduciary in good faith.... The Department will consider that a fiduciary has determined adequate consideration in accordance with section 3(18)(B) of the Act ... only if both of these requirements are satisfied.

53 Fed. Reg. 17632 (May 17, 1988). "Although proposed regulations have no legal effect, numerous circuit courts have adopted the DOL's proposed definition of adequate consideration." *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 619 (2d Cir.2006). Relying on language in *Howard v. Shay*, 100 F.3d 1484 (9th Cir.1996), that is similar to the proposed regulation, the Second Circuit has indicated that the Ninth Circuit adopted the proposed regulation. *See Henry*, 445 F.3d. at 619 ("To enforce [ERISA fiduciary rules], the court focuses not only on the merits of the

transaction, but also on the thoroughness of the investigation into the merits of the transaction." (quoting *Howard*, 100 F.3d at 1488 (internal quotation marks omitted))). Although the Ninth Circuit applies a standard similar to the proposed regulation, it has not expressly adopted the proposed regulation.

As this court previously explained, courts "decline to take cognizance of the proposed regulations ... because a proposed regulation does not represent an agency's considered interpretation of its statute." *DeFazio*, 2007 WL 3231670, at *10; *see Draper v. Baker Hughes Inc.*, 892 F.Supp. 1287, 1293 (E.D.Cal.1995) (disregarding a proposed regulation issued by the Department of the Treasury relating to the COBRA statute, noting that "almost a decade has passed since COBRA's Enactment, and the promised regulatory guidelines have not materialized"). The court will therefore rely on Ninth Circuit precedent, not the Department of Labor's proposed regulation that has not, for some reason or no reason at all, been adopted since its proposal over twenty years ago.

determined fair market value based upon "a prudent investigation in the circumstances then prevailing"); *see also Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 619 (2d Cir.2006) ("Whether a fiduciary has made a proper determination of fair market value depends on whether the parties are 'well-informed about the asset and the market for that asset.'" (quoting *Cunningham*, 716 F.2d at 1467)). Failure to "investigate suspicions that one has with respect to the funding and maintenance of the plan constitutes a breach of" the duty to act in the best interests of the plan participants. *Barker*, 64 F.3d at 1403.

### b. *Firestone and the Moench Presumption*

Relying on *Firestone*, 489 U.S. 101, 109 S.Ct. 948, defendants argue that the Trustees' decision to enter into and perform under the terms of the mid–80s agreement—including the purported setting of "fair market value" of JDS common stock in the mid–80s agreement—is entitled to a presumption that the Trustees acted prudently and reasonably because the Plan Instrument vested the Trustees with broad discretion. In *Firestone*, the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109

S.Ct. 948; *accord Burke v. Pitney Bowes Inc. Long–Term Disability Plan*, 544 F.3d 1016, 1023–24 (9th Cir.2008) (recognizing the holding from Firestone and explaining that, "[w]hen a plan unambiguously gives the plan administrator discretion to determine eligibility or construe the plan's terms, a deferential abuse of discretion standard is applicable" to a denial of benefit claim).

Section 1132, however, lays out several claims for relief and plaintiffs' claims are brought under subsections (a)(2) and (a)(3), not subsection (a)(1)(B).[20] Not only was *Firestone*'s holding limited to claims under § 1132(a)(1)(B), the Court explicitly indicated that its discussion was "limited to the appropriate standard of review in § 1132(a)(1)(B) actions challenging denials of benefits based on plan interpretations" and that it "express[ed] no view as to the appropriate standard of review for actions under other remedial provisions of ERISA." *Firestone*, 489 U.S. at 108, 109 S.Ct. 948. Accordingly, Firestone does not govern the conduct at issue in this case because plaintiffs are not seeking relief for a denial of their benefits under § 1132(a)(1)(B). *See John Blair Commc'ns, Inc. Profit Sharing Plan v. Telemundo Grp., Inc. Profit Sharing Plan*, 26 F.3d 360, 369 (2d Cir.1994) ("[W]e decline to apply the arbitrary and capricious standard [from *Firestone*] to the fiduciary conduct at issue here because this case

---

**20.** Section 1132(a) provides:
Persons empowered to bring a civil action. A civil action may be brought—
(1) by a participant or beneficiary...
 (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or
 (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan....
29 U.S.C. § 1132(a).

does not involve a simple denial of benefits, over which the plan administrators have discretion.... [D]ecisions that improperly disregard the valid interests of beneficiaries in favor of third parties remain subject to the strict prudent person standard articulated in § 404 of ERISA.").

Nonetheless, courts have extended application of the deferential review applied in Firestone to claims other than those for a denial of benefits under § 1132(a)(1)(B). In *Moench v. Robertson*, 62 F.3d 553 (3d Cir.1995), the plaintiffs sought relief under § 1132(a)(2), alleging that the fiduciaries of their employee stock option plan ("ESOP") breached their duties when they invested solely in employer common stock even though the employer was deteriorating financially. Recognizing that "the arbitrary and capricious standard of review allowed in *Firestone* should not be applied mechanically to all ERISA claims," the Third Circuit reasoned that "the Court's mode of analysis is certainly relevant to determine the standard of review pertaining to all claims filed under ERISA challenging a fiduciary's performance." *Moench*, 62 F.3d at 565. Developing what has been coined as the *"Moench* presumption," the Third Circuit held:

> [A]n ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision. However, the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion by investing in employer securities.

*Id.* at 571.

Consistent with every circuit that has evaluated the *Moench* presumption, the Ninth Circuit recently adopted the presumption in *Quan v. Computer Scis. Corp.*, 623 F.3d 870 (9th Cir.2010). Similar to *Moench*, the plaintiffs in *Quan* asserted claims under § 1132(a)(2), alleging that the fiduciaries of their eligible individual account plan ("EIAP") made imprudent investments in their employer's common stock.

The Third Circuit's development of the *Moench* presumption, and the Ninth Circuit's adoption of it in *Quan*, centered around the fact that the plaintiffs challenged the fiduciaries' decisions to invest in employer stock even though the plans in both cases required or encouraged the fiduciaries to invest in employer stock and ERISA exempted the fiduciaries of the plans from the general duty to diversify plan investments. *See* 29 U.S.C. § 1104(a)(2) ("In the case of an eligible individual account plan (as defined in section 1107(d)(3) of this title), the diversification requirement of paragraph (1)(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is not violated by acquisition or holding of qualifying employer real property or qualifying employer securities."); *Quan*, 623 F.3d at 881 ("Congress has granted favored status to ESOPs and other EIAPs by exempting them from certain ERISA requirements.... We adopt the *Moench* presumption because it provides a substantial shield to fiduciaries when plan terms require or encourage the fiduciary to invest primarily in employer stock."). In *Moench* and *Quan*, the plaintiffs did not allege that the conduct at issue constituted prohibited transactions under ERISA or that adequate consideration was not paid for the employer stock.

Unlike the plans and claims at issue in *Moench* and *Quan*, plaintiffs' claims do not conflict with ERISA, the terms of the Plan Instrument, or the Congressional policy in favor of plans that "tie employee compen-

sation to the company's success."[21] *Quan*, 623 F.3d at 881. Section 1106(a)(1) unequivocally prohibits the sale of HolliShare's JDS stock to JDS unless the sale was for adequate consideration. 29 U.S.C. §§ 1106(a)(1), 1108(e). ERISA then defines "adequate consideration" as "the fair market value of the asset *as determined in good faith by the trustee or named fiduciary* pursuant to the terms of the plan and in accordance with regulations promulgated by the Secretary [of Labor]." *Id.* § 1002(18) (emphasis added). As the Ninth Circuit has explained, this places a heavy burden on the fiduciaries "to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." *Howard*, 100 F.3d at 1488–89.

Not only have defendants failed to cite a single case in which plaintiffs challenged a transaction as prohibited under ERISA and the court applied the more deferential standard of review, applying the more lenient standard would be inconsistent with ERISA's explicit requirement of a good faith determination and courts' application of the more exacting standard. For example, when evaluating whether a plan received adequate consideration under § 1002(18) in *Howard*, the Ninth Circuit stated that a fiduciary had "the burden of proving that he fulfilled his duties of care and loyalty" and discussed the various inquiries the fiduciary must have undergone to fulfill his burden. *Id.* at 1488–89. The court ultimately found in favor of plaintiffs because, even though the fiduciaries obtained an independent assessment from a financial advisor, the fiduciaries failed to "meaningfully review, discuss, or question the valuation" or assumptions used. *Id.* at 1489–90. The Ninth Circuit neither consid-

ered nor applied a more deferential standard, and the breaches at issue in *Howard* are similar to the alleged breaches in this case.

It could still be argued that, because § 1002(18) contemplates adherence to the ERISA plan in determining fair market value, if a plan vests the fiduciary with discretion in arriving at the fair market value, the fiduciary's valuation would be subject to the less stringent abuse of discretion review. *See* 29 U.S.C. § 1002(18) ("[T]he fair market value of the asset as determined in good faith by the trustee or named fiduciary *pursuant to the terms of the plan* and in accordance with regulations promulgated by the Secretary [of Labor]." (emphasis added)). As the Second Circuit explained, however, reviewing "decisions that improperly disregard the valid interests of beneficiaries in favor of third parties" under a standard less stringent than the "the strict prudent person standard articulated in § 404 ... would allow plan administrators to grant themselves broad discretion over all matters concerning plan administration, thereby eviscerating ERISA's statutory command that fiduciary decisions be held to a strict standard." *John Blair Commc'ns, Inc. Profit Sharing Plan*, 26 F.3d at 369; cf. 29 U.S.C. § 1104(a)(1)(D) (requiring a fiduciary to discharge his duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]").

Lastly, even assuming the Plan Instrument vested the Trustees with discretion to determine the fair market value and that, under the reasoning of *Firestone*, their determination should be reviewed only for an abuse of that discretion, defendants' conduct in this case would still not

---

**21.** Understandably in light of Hollister and JDS's exceptional performance, plaintiffs do

not attack the Trustees' decision to primarily invest the Plan assets in JDS common stock.

be reviewed under the less stringent standard of review. As the *Moench* Court recognized in response to the argument that the plan gave the trustees the discretion to interpret the plan, "the deferential standard of review of a plan interpretation 'is appropriate only when the trust instrument allows the trustee to interpret the instrument *and when the trustee has in fact interpreted the instrument.*'" *Moench*, 62 F.3d at 567 (quoting *Trustees of Cent. States, Se. & Sw. Areas Health & Welfare Fund v. State Farm Mut. Auto. Ins. Co.*, 17 F.3d 1081, 1083 (7th Cir.1994)); *see also Moench*, 62 F.3d at 567–68 ("[T]his is not a case implicating the arbitrary and capricious standard of review. The Committee points to nothing in the record indicating that it—the *Committee*-actually deliberated, discussed or interpreted the plan in any formal manner.... 'Thus, if the trustee without knowledge of or inquiry into the relevant circumstances and merely as a result of his arbitrary decision or whim exercises or fails to exercise a power, the court will interpose.'" (quoting Restatement (Second) of Trusts § 187, comment (h))).

As discussed in greater detail below, however, there was no testimony that the Trustees used the December 31 book value because they determined that it reflected the "fair market value" of the JDS stock. Without having exercised the discretion presumably afforded the Trustees in the Plan Instrument, any argument that the determination is subject to review only for an abuse of that discretion must fail.

### c. *Trustees' Lack of Investigation*

The court must therefore determine whether, at trial, the fiduciaries carried their burden of proving that they fulfilled their duties under §§ 1104(a)(1), (a)(1)(B), and 1108(e), which required them "at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." *Howard*, 100 F.3d at 1488–89 (quoting *Leigh v. Engle*, 727 F.2d 113, 125–26 (7th Cir.1984)) (internal quotation marks omitted). At trial, plaintiffs' central focus was that the Trustees breached their duties when they sold HolliShare's JDS shares to JDS at the December 31 book value from the prior year without determining that the sale price was for "adequate consideration" and, consequently, sold the Plan's JDS stock to JDS for less than "adequate consideration."

The consistent testimony from the Trustees who testified at trial was that, after the mid–80s agreement, the Trustees used the December 31 book value as the sale price for HolliShare's JDS stock. At trial, Winn and Zwirner testified at length about the arguably "exceptional" circumstances that led to the mid–80s agreement, including Hollister's six-year arbitration with its international distributor that put severe financial strains on the company, (Tr. 644–46, 2376), uncertainty in predicting HolliShare's liquidity needs in upcoming years, and concerns about whether JDS could satisfy HolliShare's increasing cash needs, (Tr. 656–58, 2071:15–22). Because the controlling inquiry examines "how the fiduciary acted viewed from the perspective of the time of the [challenged] decision rather than from the vantage point of hindsight," *Roth v. Sawyer–Cleator Lumber Co.*, 16 F.3d 915, 918 (8th Cir.1994) (alteration in original) (internal quotation marks omitted), the circumstances in the mid–80s may very well have merited use of the agreement JDS and HolliShare reached. The agreement, however, neither demonstrates that the Trustees sought to determine the fair market value of the JDS shares nor justifies the Trustees' unquestioning adherence to its terms.

Although the Trustees relied on the December 31 book value to set the sales price of HolliShare's JDS shares, the evidence at trial established that they never attempted to determine whether the December 31 book value was the fair market value for the Plan's stock. Specifically, Karlovsky testified that it was his understanding that the fair market value in the month of sale was the December 31 book value regardless of when the sale took place. (Tr. 406:22–407:5.) He explained that his "recollection is that [the Trustees] accepted the audited year end valuation according to the plan as the book value and [ ] used it." (Tr. 471:12–18.) Karlovsky also testified that he "didn't have the ability or skills or the basis to determine" the fair market value of JDS stock in the month of the sale because he lacked "access to understanding and the ingredients to do our book value valuation," which was done by the finance department. (Tr. 406:9–16.) He testified that he "did not attempt to calculate any other valuation" and is not aware that any of the other Trustees did either. (Tr. 471:12–18.) As Judge O'Scannlain has explained, "[i]f [fiduciaries] do not have all of the knowledge and expertise necessary to make a prudent decision, they have a duty to obtain independent advice." *Howard*, 100 F.3d at 1490 (O'Scannlain, J., dissenting on other grounds).

In addition to never attempting to determine the "fair market value" of HolliShare's JDS shares, the Trustees never requested or obtained an independent valuation of the stock by an outside auditor. Zwirner, who has been a Trustee since 1976, recognized that it was within the prerogative of the Trustees to obtain an outside appraisal, but did not recall a single time that the Trustees obtained an independent appraisal to value the Plan's JDS stock. (Tr. 1889:10–17, 2101:3–8; *accord* Tr. 393:21–23 (Karlovsky testifying that he never asked for or requested an appraisal of the JDS stock).) It appears that the first outside appraisal performed of HolliShare's JDS stock in the history of HolliShare was done at the request of defense counsel after this litigation commenced, and Zwirner, who is still a HolliShare Trustee and was aware of the appraisal, did not even request to review it. (Tr. 2495:14–25.)

Although § 1108(e) and caselaw interpreting it have never required trustees to obtain an independent audit, the Ninth Circuit has recognized that "securing an independent assessment from a financial advisor or legal counsel is evidence of a thorough investigation." *Howard*, 100 F.3d at 1489 (citing *Martin v. Feilen*, 965 F.2d 660, 670–71 (8th Cir.1992)); *see also Katsaros v. Cody*, 744 F.2d 270, 275 (2d Cir.1984) (finding that fiduciaries breached their duties when "[t]hey lacked any expertise in such important matters as capital adequacy, quality of assets, liquidity, the value of the bank's stock, and the like" and "[n]o effort was made to obtain independent professional assistance or analysis of the financial data presented to them"). In explaining that obtaining an independent assessment is "not a complete defense to a charge of imprudence," the Ninth Circuit has also held that a trustee must "(1) investigate the expert's qualifications, (2) provide the expert with complete and accurate information, and (3) make certain that reliance on the expert's advice is reasonably justified under the circumstances." *Howard*, 100 F.3d at 1489 (internal citations omitted). In light of the *Howard* court's criticism of the trustees' failure to "meaningfully review, discuss, or question the valuation" they obtained, it would go against reason for the court to conclude that trustees who did not even obtain an independent audit or perform a sufficiently similar inquiry had fulfilled their duties.

In assessing the thoroughness of trustees' investigation of an asset's fair market value, the Ninth Circuit has also found fault when the trustees "completed the transaction without negotiation." *Id.* at 1484; *accord Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 432, 434 (6th Cir.2002) (holding that plan fiduciaries failed to prove that they had made a good faith inquiry into fair market value when they, inter alia, did not engage in a negotiation to set the price of the stock). The evidence at trial in this case confirmed that, after the mid–80s agreement, the Trustees never attempted to negotiate a different price with JDS for the sale of its stock. (*See* Tr. 898:12–899:1 (McCormack testifying that he never attempted to negotiate the price); Tr. 1299:22–1300:2 (Brilliant testifying that he never suggested negotiating the price).) In fact, Zwirner testified that, "a few times over [his] 30 some years as trustee," HolliShare considered the possibility of selling JDS shares at a price higher than book value, but the Trustees always concluded that "JDS Inc. always repurchases at book and would not—just would not entertain that." (Tr. 2373:6–20.) Although Zwirner's conclusion could have ultimately been correct,[22] the Trustees never attempted to determine whether § 1108(e) demanded a higher price or, assuming it did, present information to JDS in an effort to negotiate.

The Trustees also seemed to accept the terms of the mid–80s agreement without question or a consistent understanding of its terms or justifications for them. At its inception, the mid–80s agreement did not appear to come about as a result of meaningful negotiations between JDS and HolliShare. With respect to the price, the testimony was that JDS suggested the use of the December 31 book value from the prior year, (Tr. 2059:25–2060:7), and Zwirner testified that, when sales were pursuant to the "exceptional circumstances" provision, the practice was that JDS set the terms of the sale and there was no room for negotiation. (*See* Tr. 2114:20–22, 2115:4–7 ("When JDS's board uses its discretion and uses the exceptional circumstances clause to deviate, there's not necessarily a negotiation.... JDS can determine they'll permit the exceptional circumstances under conditions they specify, and then the person wanting the exception either says yes or no. That's the way it worked in practice.").) Karlovsky also testified that he did not know how the mid–80s agreement came about and that Zwirner had simply told him it was the existing practice without explanation. (Tr. 370:23–371:2.)

Not only were the Trustees unable to produce a single document memorializing the terms of the mid–80s agreement or even pinpointing the year it was consummated, but the Trustees also lacked a consistent understanding of it. For example, defendants suggested that if the month-end book value in the month of a sale was actually lower than the December 31 book value from the prior year, HolliShare would have received the benefit of the higher value and been able to sell at the December 31 book value. Winn, on the other hand, testified that it was not his understanding that JDS would have paid the higher price if the book value in the month of sale had fallen below the December 31 book value. (Tr. 659:19–22.) Additionally, although one of the "terms" of the mid–80s agreement was that JDS would purchase all of the shares HolliShare offered, the Trustees felt the need to obtain

**22.** The parties never addressed the implications under ERISA and for HolliShare if JDS refused to repurchase HolliShare's shares at the fair market value or even at the December 31 book value.

a commitment from JDS that it would continue to purchase shares in 1999. (See Ex. 41 at 68.) After discussing the fact that the commitment would not be binding on JDS, the JDS Board agreed to make a commitment to HolliShare that included a "restatement of the historic commitment of the company to repurchase its stock and ... a new, three-year commitment that is subject to renewal annually." (*Id.*) The Trustees' unquestioning acceptance of an amorphous verbal agreement that set the price of the Plan's most valuable asset underscores their failure to perform a thorough investigation.

The Trustees also accepted the use of the December 31 book value without question even though they knew that the month-end book value during the month of each sale was almost always greater than the December 31 book value. Not only did Zwirner and Stempkinski receive monthly financial statements that included the current month-end book value for JDS because of their roles as Hollister and JDS board members, (Tr. 1107:5–11), Zwirner, McCormack, Karlovsky, and Brilliant all testified that they knew the December 31 book value was less than the month-end book value, (Tr. 2016:6–9 (Zwirner), 767:17–19, 1034:6–9 (McCormack), 404:13–23 (Karlovsky), 1325:2–10 (Brilliant)). Brilliant also testified that he did not recall having discussions with anyone about whether selling for less than month-end book value was reducing the value of HolliShare. (Tr. 1344:7–14.) In *Cunningham*, the Fifth Circuit held that fiduciaries did not fulfill their duties when, similar to HolliShare's use of an out-dated book value, the fiduciaries relied on an appraisal that was "out of date" at the time of the transaction because "the factual assumptions upon which it was based were no longer valid." *Cunningham*, 716 F.2d at 1469.

The evidence at trial also revealed that at least Zwirner knew that an *outside* appraisal of JDS had been conducted as part of a capitalization study in anticipation of the termination of the 1977 Preferred Share Trust and that the outside appraisal suggested that the market value of JDS stock without any ownership or transfer restrictions was at least 3.4 times book value. (Tr. 102:14–18, 122:24–123:22.) Of course, a valuation of JDS stock without ownership restrictions was entirely hypothetical because the shares of JDS stock could not be sold on the public market. In receipt of such information, however, a prudent fiduciary would at least inquire whether an outside appraiser would value JDS stock above book value even with the restrictions.

Not only did ERISA require the Trustees to ensure they were receiving adequate consideration to sell HolliShare's shares to JDS, the use of the December 31 book value should have prompted a thorough inquiry by the Trustees because, when the Plan sold its shares to JDS at the December 31 book value, the evidence suggests the Trustees may have personally benefitted as individual shareholders. Zwirner acknowledged that, when HolliShare sold below month-end book value and JDS retired the purchased shares, the current book value for each outstanding share increased and, as an owner of outstanding shares, the value of his shares also increased. (Tr.2050:6–14.) At a minimum, a prudent fiduciary would have questioned and assessed the justifications for this "transfer of value" that occurred when HolliShare sold its shares for less than the month-end book value.

It appears the only Trustee who ever questioned the use of the December 31 book value was Karlovsky. When he first became Trustee, he wondered whether the use of the December 31 book value affect-

ed the Plan and "went back and [ ] used [his] mathematical modeling capabilities and [ ] work experience in benefits to do some simulation and sensitivity analysis to see if [the use of the December 31 book value] had a significant impact on the plan." (Tr. 354:9–13.) Based on the results of his simulation, Karlovsky concluded that it did not. Tellingly, however, Karlovsky's concern was whether use of the December 31 book value from the prior year had made "a significant difference to the overall operation of the plan," (Tr. 352:6–7), not whether the price constituted the "fair market value" of the Plan's JDS stock. Even assuming Karlovsky's simulation was accurate, determining that a price does not have a long-term detrimental effect on the plan does not fulfill the trustee's duty to ensure that the plan receives adequate consideration under § 1108(e) for each sale.

All of the Trustees were also individual shareholders under the direct shareholder program and thus knew that they received month-end book value when they sold their shares to JDS under the right of first refusal provision. The court's overall impression from the testimony was that the Trustees never meaningfully questioned the disparity in price between HolliShare's sales and individual shareholders' sales that occurred in the same month. As an explanation for the use of the December 31 book value from the prior year for the sale of HolliShare's shares and the month-end book value for the sales of the individual shareholders' shares, defendants explain that HolliShare received the lower price because the December 31 book value was the only audited number and HolliShare

received all cash. The court recognizes that a prudent trustee would generally prefer to use an audited value. Here, however, nothing precluded the Trustees from obtaining an audit of a month-end book value and, because a sale generally occurred only once a year, the burden of obtaining a single updated valuation based on the annual audited valuation would not have been unbearably burdensome. Moreover, the Trustees' justification for using the December 31 book value because it was audited was not entirely convincing in light of Zwirner's testimony that he could not recall a single month in his tenure as Trustee when the audited December 31 book value differed from the December 31 book value JDS calculated and submitted to the auditors.[23] (Tr. 2144:8–13.) JDS also tracked its monthly book value and McCormack testified that, in his over ten years with Hollister, he does not recall a single month when JDS determined its calculation of a month-end book value had to be adjusted or was calculated incorrectly. (Tr. 1105:7, 1106:7–13.)

■ With respect to the fact that HolliShare required cash payments for JDS's purchases of its shares and the JDS Articles provided for the individual shareholders to receive a promissory note for sales over a certain sum, the court agrees with defendants that the cash payment could detrimentally affect the value of HolliShare's shares and that the Trustees would be required to consider this factor in determining the fair market value of the Plan's shares. Nonetheless, while a prudent trustee may have determined that the significant cash need decreased the fair

---

**23.** It appears that the book value for 1983 was adjusted because the 1984 HolliShare Highlights state, "A change in Financial Accounting Standards Board requirements, implemented in JDS' 1983 financial statements audited by Arthur Andersen & Co., resulted in an increase in the book value of JDS common shares from $39.21 to $41.08 per share as of December 31, 1983." (Ex. 4-4.9.) Zwirner testified that he has "no recollection of this discrepancy between the company's books and the audited figure." (Tr. 2456:7–9.)

market value of HolliShare's stock, the evidence shows that the Trustees never attempted to quantify how HolliShare's cash needs affected the value of its stock. Depending on the year and the month of a sale, the difference between the December 31 book value and month-end book value inevitably varied. Defendants have not satisfied the court that the Trustees determined that the difference between the December 31 book value and the month-end book value of each sale had any correlation to the decrease in value of HolliShare's stock because of their need for cash payments.

### d. *Transfer and Ownership Restrictions*

The Trustees emphasize that they were familiar with the JDS Articles and transfer and ownership restrictions on JDS stock and considered these restrictions when they sold for the December 31 book value.[24] With the exception of Brilliant, who had not even read the JDS Articles before this litigation commenced, (Tr. 1276–78, 1295:14–1296:1, 1280:22–24), the other Trustees were generally familiar with the JDS Articles and the transfer and ownership restrictions on JDS stock. Although nothing in the HolliShare Trust or JDS Articles required the Trustees to sell HolliShare's shares at the December 31 book value, defendants contend that the ownership and transfer restrictions in the JDS Articles limited the value of JDS stock.

It is without question that the fair market value of JDS stock was affected by the restrictions in the JDS Articles that limited ownership to HolliShare, select employees, and the preferred share trusts and the transfer restrictions that gave JDS the right of first refusal. As the *Cunningham* court explained, "[a]ppraisal of closely-held stock is a very inexact science" that has a "level of uncertainty inherent in the process and [a] variety of potential fact patterns." *Cunningham,* 716 F.2d at 1473; *accord Rhodes v. Amoco Oil Co.,* 143 F.3d 1369, 1372 (10th Cir.1998) ("[T]here is no universally infallible index of fair market value." (quoting *Amerada Hess Corp. v. Comm'r,* 517 F.2d 75, 83 (3d Cir.1975) (alteration in original) (internal quotation marks omitted))).

Defendants rely heavily on *Krueger International, Inc. v. Blank,* 225 F.3d 806 (7th Cir.2000), to argue that defendants complied with their fiduciary duties. In *Krueger,* an employee at a privately held company had stock as part of the company's Salaried Employees Retirement Plan. *Krueger,* 225 F.3d at 808. The company's Stockholders Agreement provided for the company to have the "option to redeem all" of its stock when an employee died and set the purchase price for redeemed stock at "the proportionate value of the Appraised Value of all shares [of its stock] as of the last day of the fiscal period ... ending on or immediately proceeding the date of notice of exercise of the option." *Id.* (quoting subsections 4.4 and 6.1 of the Shareholders Agreement) (internal quotation marks omitted). When one of the company's employees died in 1996, a dispute arose between the potential beneficiaries, and the company notified the beneficiaries that it intended to redeem all of the employee's shares, but would not disburse any proceeds until the appropriate beneficiaries were determined. *Id.* at 808–09.

---

24. Judge Karlton originally rejected defendants' argument that the settlor doctrine bars plaintiffs' claims, *Ellis,* 2006 WL 988529, at *5–6, and the undersigned declined to reconsider it a year later. *See DeFazio,* 2007 WL 3231670, at *4. As has been previously discussed in two prior orders in this case, the settlor doctrine does not preclude plaintiffs' claims. Moreover, even assuming the design of the HolliShare Plan dictated the use of book value, it did not dictate the use of December 31 book value.

When the state supreme court resolved the entitlement disputes between the beneficiaries four years later, the price of the company's stock had increased substantially. *Id.* at 809. The beneficiaries and company therefore disputed whether the "fair market value" of the stock should be set at the 1996 price when the company exercised its option or the 2000 price when the transaction was completed and the benefits were paid.

The Seventh Circuit explained that the "repurchase option is an inseparable part of owning" the company stock and that, because the stock was encumbered by a purchase option at the time of the employee's death, if the company exercised that option, then, under the Shareholders Agreement, the purchase price was set in 1996. *Id.* at 812–13. It explained, "[b]ecause the fair market value of stock that someone else has the right to purchase for $258.70 is just $258.70 (at least as long as the stock alone is worth more than that), there would be no violation of the ERISA 'adequate consideration' rules for [the company] to pay that amount per share (plus the interest, of course) to the beneficiaries." *Id.* at 813.

Although the reasoning from *Krueger* that the restrictions in a Shareholders Agreement—or here, the JDS Articles—affects the price of the stock, the case is distinguishable. In *Krueger*, the parties disputed whether adequate consideration was determined at the time the call was exercised or at the time the transaction was completed. The parties did not dispute the valuation method used to determine the price of each share in 1996 or 2000. *Krueger* therefore did not engage in the inquiry that is dispositive to plaintiffs' claims under § 1108(e)—whether the Trustees engaged in a sufficient investigation to determine the fair market value of the Plan's JDS stock. In *Krueger*, because the appraised value of the stock was not at issue, the Shareholders Agreement set the purchase price of the stock at the time of the call. In this case, while the JDS Articles undeniably *affect* the fair market value of JDS Stock, they never *set* it at the December 31 book value.

■ As the Second Circuit has explained, "[t]he court's task is to inquire whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Henry*, 445 F.3d at 618 (quoting *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir.1984) (alteration in original) (internal quotation marks omitted)). Here, the Trustees never attempted to quantify the amount by which the transfer and ownership restrictions affected the value of the Plan's JDS stock. Even assuming that use of the book value system was appropriate to value JDS,[25] an inquiry into and correlation between the use of the December 31 book value versus the month-end book value never occurred.

### e. *Hypothetical Prudent Fiduciary*

Lastly, defendants argue that the court should follow the Eighth Circuit's holding

---

**25.** The court is not suggesting that the use of book value was per se imprudent or violated ERISA. In a closed-corporation, it may very well be that book value is the most reliable and accurate method to assess the fair market value. In this case, use of book value was also consistent with the JDS Articles, Schneider's principles, and the 1999 Preferred Share Trust. Here, however, the fiduciaries never investigated whether the use of book value was appropriate and ERISA unquestionably required them to do so. Putting aside the Trustees' failure to use the month-end book value, they failed to investigate whether discounts or increases had to be made to the book value in order to arrive at the fair market value of the closely held stock.

in *Roth*, 16 F.3d 915. In *Roth*, the Eighth Circuit held that, "[e]ven if a trustee failed to conduct an investigation before making a decision, he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway." 16 F.3d at 919; *accord Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286 (5th Cir.2000); *Herman v. Mercantile Bank, N.A.*, 143 F.3d 419, 421 (8th Cir.1998). The Eighth Circuit reasoned that such an exception was justified because, if the Trustees actually sold assets for fair market value even in the absence of an investigation to determine fair market value, "there was no causal connection between their allegedly deficient conduct and a loss to the ESOP." *Roth*, 16 F.3d at 919.

When it first introduced the "hypothetical prudent fiduciary" standard, the Eighth Circuit relied on a concurring opinion from then-Judge Scalia in *Fink v. National Savings and Trust Co.*, 772 F.2d 951 (D.C.Cir.1985). Specifically, in *Fink*, Judge Scalia commented that he did not know of a "case in which a trustee who has happened-through prayer, astrology or just blind luck-to make (or hold) objectively prudent investments (*e.g.*, an investment in a highly regarded 'blue chip' stock) has been held liable for losses from those investments because of his failure to investigate and evaluate beforehand." *Id.* at 962. Judge Scalia explained that "[i]t is the imprudent investment rather than the failure to investigate and evaluate that is the basis of suit." *Id.*

While reasoning that a fiduciary who happens to make a prudent investment despite his lack of investigation is not liable in "an action for damages arising from losing investments," Judge Scalia nonetheless recognized that such a "[b]reach of the fiduciary duty to investigate and evaluate would sustain an action to enjoin or remove the trustee or perhaps even to recover trustee fees paid for the investigative and evaluative services that went unperformed." *Id.* (citation omitted). While the "hypothetical prudent fiduciary" inquiry may therefore limit an award of damages against a fiduciary who fails to investigate but nonetheless makes a prudent investment, Judge Scalia's concurring opinion in *Fink* does not support the conclusion that the fiduciary is absolved from all liability under ERISA.

The Seventh Circuit similarly concluded that a plan was not entitled to damages based on a fiduciary's "imprudent but harmless conduct," but could nonetheless seek appropriate equitable relief, such as an injunction. *Brock v. Robbins*, 830 F.2d 640, 647 (7th Cir.1987); *see also id.* at 647 ("[N]o court has held trustees *liable in money damages* for imprudent conduct which resulted in no loss or damages to the ERISA plan and no benefit or gain to the trustees and did not put the assets of the plan at risk." (emphasis added) (internal quotation marks omitted)); *cf. Donovan v. Bierwirth*, 754 F.2d 1049, 1052 n. 3 (2d Cir.1985) ("[T]here can be a breach of duty without any 'loss' to a plan."). Consistent with numerous other circuits, the Ninth Circuit has also emphasized that the inquiry under §§ 1108(e) and 1104(a)(1)(B) is focused on the defendants' conduct, not the result. *See Howard*, 100 F.3d at 1488; *see also Cunningham*, 716 F.2d at 1467 ("[I]t is especially significant that the adequate consideration test, like the prudent man rule, is expressly focused upon the *conduct* of the fiduciaries.") (emphasis added); *Henry*, 445 F.3d at 619 ("[I]n practice, the 'fair market value' inquiry overlaps considerably with the 'good faith' inquiry; both are 'expressly focused upon the conduct of the fiduciaries.'" (quoting *Cunningham*, 716 F.2d at 1467)); *Eyler v. Comm'r of Internal Revenue*, 88 F.3d 445, 455 (7th Cir.1996) ("ESOP fiduciaries will carry the burden of proving that adequate

consideration was paid 'by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing.' Thus, the adequate consideration test focuses on the conduct of the fiduciaries in determining the price, not the price itself." (quoting *Cunningham,* 716 F.2d at 1467 (citation omitted))).

▇ Accordingly, while determining whether the Trustees' failure to investigate the fair market value of JDS stock caused monetary loss to plaintiffs and HolliShare would affect an award of *damages,* financial loss is not required to prove a breach of a fiduciary duty under §§ 1108(e) and 1104(a)(1)(B) and the court will not apply the "hypothetical prudent investor" exception to absolve defendants from *liability. Chao,* 285 F.3d at 436 (rejecting application of the "hypothetical reasonable fiduciary" standard because doing so would "ignore" the second part of the "adequate consideration" definition, which requires that the fair market value is "determined in good faith by the trustee").

### 2. *Claims Against Hollister Board Members & JDS*

▇ To qualify as an ERISA fiduciary, an individual or entity may either be named as a fiduciary under the terms of an ERISA plan, *see* 29 U.S.C. § 1102(a), or act as a functional or *de facto* fiduciary by exercising discretionary control over the management or administration of the plan or its assets, *see id.* § 1002(21)(A). When an individual or entity is a named fiduciary, that fiduciary's liability may be limited

pursuant to provisions of a plan instrument that allocates responsibility among named fiduciaries. *See Walker v. Nat'l City Bank of Minneapolis,* 18 F.3d 630, 633 (8th Cir.1994) ("[U]nless ERISA mandates otherwise, division of authority in the plan determines the duties of the various fiduciaries."); 29 C.F.R. § 2509.75-8(D–4) (noting that a plan instrument may allocate responsibility among named fiduciaries).

Here, the Trust Instrument specifies Hollister, the HolliShare Trustees, and the Hollister Board as named fiduciaries. (Ex. 9–9.14, § 11.11.) Hollister is responsible for administration of the Plan, (*id.*),[26] the Trustees are responsible for management of the Plan's assets, (*id.* §§ 11.01, 11.02), and the Hollister Board has the authority to appoint and remove the Trustees, (*id.* §§ 11.05–11.07). The Board also has the authority to inspect and audit HolliShare's records and receive reports from the Trustees. (*Id.* § 11.04.)

#### a. *Hollister Board Members*

The Trustee defendants who also served on the Hollister Board are Zwirner and Stempinski and the non-trustee defendants who served on the Hollister Board are Winn and Herbert. Plaintiffs do not dispute that the Hollister Board appointed competent individuals to serve as the HolliShare Trustees, but alleges that the Board breached its duty to monitor the Trustees it appointed. The Hollister Board's potential liability therefore arises only from its fiduciary duty to appoint and monitor[27] the HolliShare Trustees. *See* 29

---

**26.** Plaintiffs neither presented evidence at trial nor submitted proposed findings of fact and conclusions of law with respect to any claims against Hollister as the plan administrator. Although Ellis requested the court appoint a new plan administrator, the DeFazio/Dimaro plaintiffs' proposed order would have Hollister remain as the plan administrator. (Dock-

et Nos. 650–53, 662.) The court will therefore enter judgment in favor of Hollister.

**27.** After trial, defendants argued in a footnote that there "is conflicting Ninth Circuit authority regarding whether the persons who appoint fiduciaries of an ERISA plan have a fiduciary duty to monitor reasonably the ac-

C.F.R. § 2509.75–8 (FR–17) ("[T]rustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards. . . ."); *In re Calpine Corp.*, No. 03–1685, 2005 WL 1431506, at *3 (N.D.Cal. Mar. 31, 2005) (noting that the "power of appointment gives rise to a limited duty to monitor").

■ Here, the vast majority of HolliShare's holdings consisted of JDS common shares, meaning that almost all of the Plan's transactions fell explicitly within ERISA's prohibited transaction provision. ERISA unequivocally required the Trustees to conduct a good faith investigation to determine the fair market value of the Plan's shares of JDS stock and sell those shares at that value. The evidence at trial established that the Hollister Board knew that HolliShare had been selling its shares at the December 31 book value since at least the mid–80s and that the December 31 book value was less than the month-end book value.[28] Not only did the Trustees fail to perform an adequate investigation to determine the fair market value, the Hollister board members understood that the December 31 book value was always used and had no reason to conclude that an investigation to determine the fair market value of the JDS shares led to that price. (*See* Tr. 1881:11–1883:22.) The continual use of a preset sales price and lack of any document or discussion suggesting that the Trustees had performed an investigation to determine the fair market value of the Plan's shares should have served as a red flag to the Hollister board members that the Trustees were not fulfilling their duties under ERISA. The court thus finds that the Hollister board members breached their duty to adequately monitor the HolliShare Trustees. *Cf. Leigh*, 727 F.2d at 135–36 (holding that appointing fiduciaries who were aware of the plan trustees' conflicting loyalties in certain transactions were obliged to take extra measures to monitor the trustees' actions).

### b. JDS

Unlike the Hollister Board, the Trust Instrument does not name JDS as a fiduciary. Plaintiffs contend, however, that JDS was a *de facto*, or functional, fiduciary of HolliShare based on the discretionary

---

tions of their appointees" and that various courts have rejected imposition of a duty to monitor appointed fiduciaries. (*See* Defs.' Proposed Findings & Conclusions at 167 n. 397.) This position is the exact opposite of the position defendants argued in their motion for summary judgment: "Moreover, while the power to appoint plan trustees carries with it the duty to monitor the trustees' activities, the Hollister Board did so as a matter of undisputed fact." (Docket No. 484 at 3:24–25.)

The court recognizes that there is authority suggesting that the limited duty to appoint trustees might not give rise to a duty to monitor those trustees. *See Gelardi v. Pertec Computer Corp.*, 761 F.2d 1323, 1325 (9th Cir.1985) (per curiam) (holding that an employer who appointed the plan administrator was only a fiduciary and liable as such with respect to the selection of the administrator). The court, however, previously adhered to the position both parties advanced and will not hold otherwise when there has not been a change in the controlling law. Moreover, in addition to the duty to appoint trustees, the Hollister Board also has the authority to inspect and audit HolliShare's records and receive reports from the Trustees. These powers are consistent with an oversight and monitoring role.

28. Winn also testified that he knew that JDS "had a value in the outside world higher than book value." (Tr. 140:18–20.) He gained this knowledge as a result of the capitalization study, but never shared the information with Karlovsky, one of the Trustees. (Tr. 391:22–393:23.)

control and authority it exercised over the management of HolliShare's main asset. Plaintiffs rely on the evidence at trial establishing that JDS, through the mid–80s agreement, proposed and established the practice of HolliShare selling its shares to JDS once per year at the December 31 book value. At least one HolliShare Trustee testified that he did not feel HolliShare could negotiate for a higher price because JDS had always paid the December 31 book value and he did not feel that the price was open to negotiation. (Tr. 2114:20–22, 2115:4–7.)

■ When determining whether a person is a *de facto* fiduciary, "the threshold question is not whether the actions of some person ... adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich,* 530 U.S. 211, 226, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). "An individual or entity performs a 'fiduciary' function with respect to a pension plan when 'exercis[ing] any discretionary authority or discretionary control respecting management of such plan or exercis[ing] any authority or control respecting management or disposition of its assets' under ERISA." *Wright v. Or. Metallurgical Corp.,* 360 F.3d 1090, 1101 (9th Cir.2004) (quoting 29 U.S.C. § 1002(21)(A)).

The strongest theory suggesting that JDS had discretionary control over HolliShare's shares of JDS stock is that JDS was—at least in practice—the only buyer for HolliShare's shares and therefore could render HolliShare unable to meet its cash needs by refusing to purchase its shares. This dynamic, however, is part in parcel of the design of the HolliShare plan as a profit-sharing plan and JDS as a closely held corporation with severe ownership restrictions. While JDS may have proposed

the price and been reluctant to negotiate for a higher price, it was acting as a corporation making business decisions in doing so, not a fiduciary to HolliShare. Assuming the mid–80s agreement was a binding agreement between JDS and HolliShare, it was the Trustees who had the power to negotiate the terms and agree to them on behalf of the beneficiaries. It was the Trustees who had the power and obligation to ensure that the sales were for fair market value and to negotiate on behalf of the beneficiaries. It was also the Trustees who had the power to assess their cash needs for the year and decide how many shares to sell.

■ Judge Karlton previously held in this case that JDS would be an ERISA fiduciary only if it "in fact exercised any discretionary authority over plan assets." *Ellis,* 2006 WL 988529, at *7. The court is not convinced from the evidence at trial that JDS had discretion or authority to make HolliShare sell shares at a given time or that it sought to exercise authority to limit the number of shares HolliShare sold. *See Assocs. In Adolescent Psychiatry, S.C. v. Home Life Ins. Co.,* 941 F.2d 561, 570 (7th Cir.1991) ("[T]he power to act for the plan is essential to status as a fiduciary under ERISA."); *Farm King Supply, Inc. Integrated Profit Sharing Plan & Trust v. Edward D. Jones & Co.,* 884 F.2d 288, 292 (7th Cir.1989) ("[C]ases which hold that the person or firm was a fiduciary have a common theme conspicuously absent here, *viz.,* the authority to exercise control unilaterally over a portion of a plan's assets, not merely to propose investments."). The evidence at trial was that the Trustees calculated how many shares they wanted to sell and JDS bought the shares on every occasion and has provided commitments to continue to do so. (*See* Ex. 41 at 68.) The weight of the evidence does not persuade the court that

JDS ever attempted to exercise control over HolliShare's sales. Accordingly, because the court is not convinced that JDS exercised discretionary control over the Plan's assets sufficient to render it a *de facto* fiduciary, the court will enter judgment in favor of JDS.

### 3. *Co–Fiduciary Liability for Breaches under § 1104*

Section 1105(a) provides for liability of a fiduciary based on a breach of duty by a co-fiduciary:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a). Section 1105(a) "effectively imposes on every ERISA fiduciary an affirmative duty to prevent other fiduciaries from breaching their duties for which they are jointly and severally liable." *Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1157 (9th Cir.2000).

Plaintiffs appear to rely on § 1105(a)(2) and seek to hold defendants jointly liable as co-fiduciaries for losses caused by the fiduciaries' breaches of the duty of loyalty under § 1104(a)(1) and duty of prudence under § 1104(a)(1)(B). Given the court's findings that the fiduciary defendants breached their duties under § 1104(a)(1) and (a)(1)(B), it follows that their conduct enabled their co-fiduciaries to breach the same duties. *See Springate v. Weighmasters Murphy, Inc. Money Purchase Pension Plan*, 217 F.Supp.2d 1007, 1025 (C.D.Cal.2002) (holding that, because "each Defendant failed to comply with Section 1104(a)(1), and in doing so, each Defendant enabled the other fiduciaries to commit a breach," each Defendant is liable for the breaches of a co-fiduciary under § 1105(a)).

Nonetheless, because § 1105(a) requires that the fiduciary's breach "enabled such other fiduciary to commit a breach," a fiduciary's liability for any losses caused by a breach would be limited to the time in which that defendant served as a fiduciary. ERISA clearly limits liability to the time in which a defendant served as a fiduciary, stating, "No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary." 29 U.S.C. § 1109(b). Plaintiffs thus cannot simply group all the fiduciaries together when they each served different terms, and any award of damages would need to be broken down by the years in which the various defendants served as fiduciaries.

### D. *Requested Relief*

Plaintiffs brought their claims under subsections (a)(2) and (a)(3) of § 1132. Subsection 1132(a)(2) provides for a participant to bring a civil action "for appropriate relief" under § 1109, which provides:

> Any person who is a fiduciary with respect to a plan who breaches any of the

responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

29 U.S.C. § 1109(a). "Under 29 U.S.C. §§ 1109(a) and 1132(a)(2), ERISA beneficiaries may bring an action against fiduciaries who breach their duties to the plan, and may recover both damages and equitable relief from them." *Landwehr v. DuPree,* 72 F.3d 726, 733 (9th Cir.1995). "The Supreme Court has held that recovery for a violation of 29 U.S.C. § 1109 for breach of fiduciary duty inures to the benefit of the plan as a whole, and not to an individual beneficiary." *Paulsen v. CNF Inc.,* 559 F.3d 1061, 1073 (9th Cir.2009); *see also LaRue v. DeWolff, Boberg & Assocs., Inc.,* 552 U.S. 248, 256, 128 S.Ct. 1020, 169 L.Ed.2d 847 (2008) ("[A]lthough § 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account.").

"Neither section 409(a) [of ERISA, 29 U.S.C. § 1109(a) ] nor any other section of ERISA discloses the methods which are to be used in measuring the 'losses' for which breaching fiduciaries are to be held liable." *Kim v. Fujikawa,* 871 F.2d 1427, 1430 (9th Cir.1989). "The reports of the various committees concerning this section of ERISA make it clear that Congress intended to provide the courts with broad remedies for redressing the interests of

participants and beneficiaries when they have been adversely affected by breaches of a fiduciary duty." *Eaves v. Penn,* 587 F.2d 453, 462 (10th Cir.1978); *see also id.* at 462–63 ("Among the factors which the court may consider in selecting a remedy are: (1) the purposes of the trust; (2) the relative pecuniary advantages to the trust estate of the various remedies; (3) the nature of the interest of each beneficiary; (4) the practical availability of the various remedies; and (5) the extent of the deviation from the terms of the trust required by the adoption of each of the remedies.").

Subsection 1132(a)(3) provides for a participant to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). The Supreme Court has "interpreted the term 'appropriate equitable relief' in § 502(a)(3) [of ERISA, 29 U.S.C. § 1132(a)(3),] as referring to those categories of relief that, traditionally speaking (*i.e.,* prior to the merger of law and equity) were *typically* available in equity." *CIGNA Corp. v. Amara,* —— U.S. ——, ——, 131 S.Ct. 1866, 1878, 179 L.Ed.2d 843 (2011) (quoting *Sereboff v. Mid Atl. Med. Servs., Inc.,* 547 U.S. 356, 361, 126 S.Ct. 1869, 164 L.Ed.2d 612 (2006)) (internal quotation marks omitted). Because § 1132(a)(3) is limited to equitable relief, compensatory damages are not available under this subsection. *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 255–56, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993).

In *CIGNA Corp.,* however, the Supreme Court discussed, in *dicta,* the ability to award equitable relief under § 1132(a)(3) that would require a plan administrator to

award monetary compensation to already retired beneficiaries "for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." *CIGNA Corp.*, 131 S.Ct. at 1880.[29] The court referred to this as an equitable "surcharge remedy" and recognized that "[t]he relevant substantive provisions of ERISA do not set forth any particular standard for determining harm." *Id.* at 1880–81.

As the final week of trial came to a close in this case, plaintiffs could not articulate the remedy they were seeking, and suggested that the court could simply fashion appropriate equitable relief. The court is not in the business of divining appropriate relief absent a request from plaintiffs. In five different proposed orders submitted with their post-trial briefing,[30] (see Docket Nos. 650–53, 662), plaintiffs have, for the first time, identified the relief they are seeking, which includes:

1. **Removing Existing Trustees and Appointing a New Trustee:** Plaintiffs request the court to issue a preliminary and permanent injunction removing the HolliShare Trustees and barring them from serving as Plan Trustees in the future. Plaintiffs then request the court to appoint an independent trustee "to carry out the orders of the Court to calculate the losses of the Plan and to correct the fiduciary breaches and prohibited transactions."

2. **Damages:** Plaintiffs request an award of damages against the fiduciaries individually for restitution or a surcharge from 1992 through the present.[31] Plaintiffs' calculations are based on the difference between the actual price paid by JDS in each prohibited transaction (December 31 book value from the year prior to the sale) and (a) the month-end book value in the month the transaction took place *or* (b) the fair market value of the shares in the month the sale occurred as determined by an independent appraiser retained by the court-appointed trustee. If the month-end book value is used, Ellis calculates the amount of damages at $30,674,599.56, plus interest.[32] (Docket No. 650.) The DeFazio/Dimaro plaintiffs used a "slightly different damage calculation" than Ellis, and are requesting an award of $244,382,485.00.[33] (Docket No. 654.)

---

29. In *CIGNA Corp.*, the Court was addressing violations of §§ 1022(a) and 1024(b) and the surcharge that might be awarded based on the district court's reformation of the plan documents. *CIGNA Corp.*, 131 S.Ct. at 1880–81. Nothing in the Court's opinion suggests that its discussion would not apply equally to the breaches at issue in this case.

30. In their five proposed orders, plaintiffs do not request damages based on any profits the fiduciaries allegedly received as a result of their breaches.

31. Although fiduciaries can be jointly and severally liable for harms resulting from their breaches, *see Stewart*, 207 F.3d at 1157, plaintiffs erroneously seek to hold all of HolliShare's fiduciaries liable for all losses regardless of when each defendant served as a fiduciary. *See* 29 U.S.C. § 1109(b) ("No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary."). Assuming the breaches caused loss to the Plan, damages would have be broken down by year and only the defendants who breached fiduciary duties in a particular year could be liable for losses caused that year.

32. Of the $30,674,599.56, plaintiffs claim that Ellis is entitled to $108,917.87. (Docket No. 650.)

33. Of the $244,382,485.00, plaintiffs claim that Beetham is entitled to $78,032.68; DiMaro is entitled to $10,430.00; Humphries is entitled to $41,537.00; Lavick is entitled to $4,212.00; McNair is entitled to $980.00; Pace is entitled to $100,345.00; Seay is entitled to $882,055.00; Stanton is entitled to $110,803.00; Wirth is entitled to $23,414.00; and DeFazio and Ellis are entitled to $5,634,083.00. (Docket No. 654 at 4.) The remainder would be awarded to the Plan.

3. **Recovery of Excess Shares:** As an alternative to an award of damages, plaintiffs seek an order against the fiduciaries individually requiring them to recover the excess shares redeemed by JDS in the transactions from 1992 to the present and restore the shares to HolliShare, with the value of the excess shares distributed to each participant's account for each of the years. The excess shares would be calculated based upon the difference between the actual shares sold in each prohibited transaction and (a) the number of shares that would have been sold in each prohibited transaction if the shares were valued at the month-end book value *or* (b) the number of shares that would have been sold in each prohibited transaction if the shares were valued at the fair market value as determined by an independent appraiser retained by the court-appointed trustee. The DeFazio/Dimaro plaintiffs have calculated what they believe was the loss to the Plan as the result of selling an excessive number of shares due to the use of the December 31 book value. They have calculated this loss to the Plan at $729,912,295.00. (Docket No. 654 at 4.)

The court now addresses each of the remedies plaintiffs seek.

### 1. *Removal of Existing Trustees and Appointment of a New Trustee*

At the close of trial during discussions with counsel about post-trial briefing, the court unequivocally raised its concerns with plaintiffs' counsel about the court's ability to grant any prospective injunctive relief, stating:

> [Y]ou better be able to explain to me why any of the plaintiffs, any one [ ] of them is entitled to any equitable relief when they no longer have an interest in the plan. I referenced that in my ruling on the motion for summary judgment, and I still fail to see how any modifications to the plan or putting money in the plan or changing how the plan is administered or changing the articles or anything else is going to inure to the benefit of any plaintiff in this case. I fail to see an Article III context how they even have standing to ask for that kind of relief when they no longer have an interest in the fund.

(Tr. 2658:7–17); *see also DeFazio*, 636 F.Supp.2d at 1076–77 (citing *Bendaoud v. Hodgson*, 578 F.Supp.2d 257, 267–68 (D.Mass.2008), for the holding that a plaintiff who was no longer a participant in a defined contribution plan had no standing to seek purely prospective relief); *see generally Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 433 F.3d 181, 199–203 (2d Cir.2005) (discussing Article III standing in the context of ERISA claims). Every single plaintiff that was a HolliShare participant had terminated his or her employment with Hollister and received a full lump sum distribution of his or her HolliShare account before commencing or joining this action.

■ Although plaintiffs' proposed orders request prospective injunctive relief, their over 350 pages of post-trial submissions are devoid of any substantive discussion addressing the court's concerns about their ability to seek such relief. When defendants pointed out the deficiency in plaintiffs' briefs on this issue, plaintiffs still failed to address the issue in their reply brief. In the face of the court's clear and direct request for authority supporting any request for injunctive relief, the court can only construe plaintiffs' silence on this issue as an admission that their requests for injunctive relief are not "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed.R.Civ.P. 11(b)(2).

Not only would it be inappropriate in this case to order removal of the existing Trustees and appoint a new trustee, the court is quite certain that appointing a new trustee as plaintiffs request would only prolong what has already been a painfully protracted case. The court has every reason to believe that an independent trustee will be unable to render decisions that both sides will believe are acceptable, thus requiring the parties to return to court in the same position they are in today, only several years later. As the court explained at trial, it is neither its role nor its desire to "step in, roll up [its] sleeves and decide how to run this company or this ERISA plan." (Tr. 2658:24–25.)

Moreover, plaintiffs do not merely request the court to appoint an independent trustee, plaintiffs also request the court to order the trustee "to calculate the losses of the Plan and to correct the fiduciary breaches and prohibited transactions." (Docket Nos. 650–53.) The purpose of the trial was for plaintiffs to put on evidence that would allow *the court* to "calculate the losses of the Plan and to correct the fiduciary breaches and prohibited transactions." Plaintiffs are essentially asking for a second chance to do what they should have done at trial.

This case has been pending in this court since 2004 and the various judges assigned to it have issued over thirty substantive orders. Plaintiffs have had more than ample time and opportunity to prove their case and could have retained experts to testify at trial about the exact calculations they are asking a court-appointed trustee to calculate. Accordingly, the court will deny plaintiffs' request for an injunction removing the existing Trustees and appointing a new trustee.

### 2. *Damages*

To seek damages under § 1132(a)(2) and (a)(3), plaintiffs generally have the burden of proving the harm caused by defendants' breaches of their fiduciary duties by a preponderance of the evidence. *See CIGNA Corp.*, 131 S.Ct. at 1881 ("[A] fiduciary can be surcharged under § 502(a)(3) only upon a showing of actual harm—proved (under the default rule for civil cases) by a preponderance of the evidence."). However, "once the ERISA plaintiff has proved a breach of fiduciary duty and a prima facie case of loss to the plan or ill-gotten profit to the fiduciary, the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by, or his profit was not attributable to, the breach of duty." *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir.1992); *accord Roth v. Sawyer–Cleator Lumber Co.*, 61 F.3d 599, 602 (8th Cir.1995). "In determining the amount that a breaching fiduciary must restore to the [ERISA plan] as a result of a prohibited transaction, the court 'should resolve doubts in favor of the plaintiffs.'" *Kim*, 871 F.2d at 1430–31; *accord Sec'y of U.S. Dep't of Labor v. Gilley*, 290 F.3d 827, 830 (6th Cir.2002) ("[T]o the extent that there is any ambiguity in determining the amount of loss in an ERISA action, the uncertainty should be resolved against the breaching fiduciary."); *Patelco Credit Union v. Sahni*, 262 F.3d 897, 912 (9th Cir.2001).[34]

In finding that defendants breached their duties under §§ 1104(a)(1), (a)(1)(B), and 1108(e) by failing to perform an investigation to determine the fair market value

---

**34.** In *Vaughn*, 567 F.3d 1021, the Ninth Circuit explained that it has "never required that [an ERISA] claim be for an 'ascertainable amount,'" but declined to determine whether it "should apply such a requirement, because in [the case], the amount sought is ascertainable, despite the fact that it is not readily apparent on the face of the First Amended Complaint." *Id.* at 1026–27.

of HolliShare's JDS stock, the court did not have to find—and did not find—that the fair market value of the JDS shares at the time of each prohibited transaction could not have been the December 31 book value. Surprisingly, after four weeks of trial, the court did not hear a single expert witness estimate the value of the JDS stock at the time of each prohibited transaction. While plaintiffs have suggested that the fair market value could be the month-end book value, which was the valuation used for individual shareholders when they sold their shares, they have alternatively suggested that the court-appointed trustee could appoint an appraiser to determine the fair market value of HolliShare's JDS shares at the time of each prohibited sale.[35] Even plaintiffs are unsure what value should have been used to ensure HolliShare received adequate consideration.

Not only did the parties present insufficient evidence to establish the fair market value of the JDS shares for each prohibited transaction, the weight of the evidence presented at trial does not persuade the court that the fair market value exceeded the December 31 book value. Most significantly, the JDS Articles severely restricted who could purchase JDS shares and thus the only market for HolliShare's sales was JDS or one of the select individuals authorized to purchase shares under the direct shareholder program. (*See* Ex. 531–36 Art. 5, ¶ II.C.) Each year, offering circulars were distributed to the eligible direct shareholders in the second or third quarter that provided them with options to purchase JDS stock *at the audited December 31 book value from the prior year.* (Tr. 558:6–559:1, 725:3–731:4, 1272:20–1273:14, 1710:5–7; *see also* Tr. 557:22–559:5 (Karlovsky explaining that the ability to purchase JDS shares at the December 31 book value even when sales were made during the following year "was considered to be one of the benefits of the direct share program").)[36] It would therefore be unreasonable to conclude that the direct shareholders would have been willing to purchase stock from HolliShare at a price that exceeded the December 31 book value. When the only other "market" for JDS shares was set at the December 31 book value, it is at least possible that the fair market value of those shares was the December 31 book value. *Cf. Krueger Int'l, Inc.,* 225 F.3d at 812–13.

Furthermore, the fact that individual shareholders who were part of the direct shareholder program were able to sell their shares at the month-end book value does not invariably lead to the conclusion

---

**35.** For the same reasons that the court declines to appoint a trustee, the court declines to invite a second trial in this case so that an expert can value the JDS stock at the time of each prohibited transaction to determine the fair market value. Any evidence the outside appraiser would consider could have been presented at trial and used to guide the court in its determination.

**36.** The Trustees never investigated whether any individuals eligible to purchase JDS shares were interested in purchasing shares from HolliShare. Brilliant testified that his "best logic" was that there was not an eligible buyer who had sufficient funds to purchase the amount of JDS stock HolliShare sold each year, but recognized that nothing precluded the Trustees from selling smaller quantities of its JDS stock to multiple buyers. (Tr. 1304:20–1305:19.) The court agrees with plaintiffs that a prudent trustee would have at least explored the option of selling shares to individual shareholders, especially because nothing precluded HolliShare from selling smaller quantities of shares to multiple buyers. Nonetheless, because eligible employees were offered options to purchase shares at the December 31 book value around the same time HolliShare sold its shares, the court finds it unlikely that an eligible employee would have paid more than the December 31 book value for HolliShare's shares.

that the fair market value of HolliShare's shares was also the month-end book value. The direct shareholders sold their shares pursuant to the right of first refusal provision in the JDS Articles, which set the sales price at the month-end book value, but also required the seller to receive most of the payment in the form of a promissory note. In contrast to the individual shareholders who sold their shares under the right of first refusal, HolliShare received payment in all cash. Winn testified about an occasion in the 1980s when he sold shares to JDS and received $5,000 in cash and the balance in a promissory note. (Tr. 663:11–14.) Because he needed all cash to satisfy an obligation, he sold the promissory note to a bank that was familiar with Hollister. (Tr. 663:20–25.) The bank, nonetheless, only paid Winn around 90% of the note's principal amount, thus illustrating that the receipt of all cash gave a significant benefit to HolliShare that direct shareholders did not receive.[37] (Tr. 663:15–664:2, 2393:20–2394:8.) Defendants' expert, Roger Grabowski, also testified at trial that the value the direct shareholders received would have to be discounted to its cash equivalent in order to compare it to the price HolliShare received. (Tr. 2537:9–23, 2543:8–15.)

Moreover, the only testimony at trial valuing JDS stock during the time-period at issue came from defendants' expert, Grabowski. Grabowski is an accredited senior appraiser with the American Society of Appraisers who has been performing business appraisals for about thirty-five years and is currently a managing director at a valuation and financial consulting firm. (Tr. 2510:1–7, 2512:6–11, 2518:15–17.) Grabowski had also been a finance professor at a university and has authored five books pertaining to valuation, including one about valuation of closely held entities that was used in a course he taught for continuing education for certified public accountants. (Tr. 2517:9–22, 2518:25–2519:4.)

Grabowski was asked to "render an opinion of the fair market value of the common shares of JDS that were held by the HolliShare plan for the period '74 through 2007." (Tr. 2527:19–25.) He concluded that the fair market value was the "formula price, which was book value," explaining:

> It is our opinion that the fair market value in this case is determined by and is equal to generally accepted accounting principles, GAAP, book value of the subject shares pursuant to the stipulated formula pricing in place and corroborated by the historical practice.... Formula, practice and right of first refusal at book value establish and limit the market. No reasonable financial investor [ ] would pay more. It is our opinion that the fair market value of the subject shares from '74 through 2007 is equal to their book value.

(Tr. 2528:18–2529:8 (reading from the "Summary of Conclusions" in Grabowski's expert report).)[38]

---

**37.** It is worth noting that the increase in the book value of JDS stock from the December 31 book value to the month-end book value in the month of each prohibited transaction between 1993 to 2007 was almost always under ten percent. Specifically, for the years in which the parties stipulated to the month-end book value in the month HolliShare sold shares, the book value of JDS stock had increased by the following percentages from December 31 to the month-end at the time of the sale: 1993 (1.2% increase); 1996 (7.88% increase); 1998 (4.16% increase); 1999 (5.34% increase); 2000 (3.6% increase); 2001 (3.24% increase); 2002 (9.7% increase); 2003 (9.45% increase); 2005 (7.21% increase); 2006 (8.33% increase); and 2007 (11.55% increase).

**38.** Grabowski's valuation does not distinguish between the December 31 book value or the

The only expert testimony plaintiffs offered about the fair market value of HolliShare's shares of JDS stock came from their expert, John Calvin Korschot. Korschot's appraisal, however, was limited to the fair market value of JDS stock as of December 31, 2003. To appraise the JDS stock, Korschot relied on the market and income approaches to come up with an initial value and then discounted that value by fifteen percent to account for the lack of marketability of JDS stock. The resulting value, however, relied on two "critical" assumptions. (Tr. 1975:11–12.) First, Korschot assumed the use of book value for HolliShare's sales of JDS shares would not be required, but would still be used for sales from individual shareholders under the right of first refusal. (*See* Tr. 1701–1706, 1729:6–10, 1795:7–12.) Second, Korschot assumed that JDS would continue its practice of buying back shares on a regular basis from the Plan at the determined "fair market value." (Tr. 1692:10–12, 1730:19–1731:4.) Not only did Korschot appraise HolliShare stock as of a single date,[39] but the court also finds his assump-

tions to be flawed and is not persuaded that an evaluation of JDS stock could vary so drastically for sales by HolliShare at his estimated "fair market value" and sales by direct shareholders set at the book value.

Plaintiffs recognize that, "[t]he testimony of the experts does not provide a complete analysis of the difference between the previous December 31 book value and the properly appraised fair market value on the dates of the transactions from years 1982 through the present." (Pls.' Proposed Findings & Conclusions 57:24–58:1.) With both parties' experts, the insufficiency of the evidence stemmed not from a lack of qualifications, but from the counsels' failure to request opinions on the relevant issues and ensure that the experts did not rely on assumptions that rendered their opinions irrelevant. Although the court must resolve any ambiguities in favor of plaintiffs, the inadequacy of the evidence on this issue resulted not from ambiguities or difficulty in computations but from the parties' failure to ask their experts the appropriate questions.[40]

month-end book value because, at the time defendants requested his opinion, plaintiffs' theory did not distinguish between the two book values. His explanation about favors affecting his valuation are nonetheless relevant.

Grabowski also testified about a "hypothetical fair market value" of JDS shares from 1997 to 2007, which he estimated exceeded the book value by 1.1 to 1.8 times depending on the year. This valuation is not relevant because Grabowski calculated this "hypothetical fair market value" as if the restrictions in the JDS Articles did not exist and there could be "freely open trading" of the stock. (Tr. 2572:7–10.)

**39.** Even if the court found Korschot's testimony and appraisal credible, his evaluation of the fair market value of JDS stock on December 31, 2003 is barely relevant to calculating damages because, in 2003, HolliShare sold shares to JDS in June, not December. (*See* Stipulation of Facts ¶ 42.) At most, Kor-

schot's testimony established that the fair market value of JDS stock as of December 31, 2003 exceeded the audited book value for that month, which could support the inference that the "fair market value" of JDS stock exceeded the book value during other months.

An additional flaw is that a persuasive explanation was not offered about how JDS's purchase of shares from HolliShare at the increased fair market value Korschot calculated would have affected the fair market value of JDS shares in subsequent years. Simple math reveals that even the book value of JDS would have decreased if it was paying a significantly higher price for its shares.

**40.** The fact that this issue was not appropriately addressed with the experts stems from the fact that plaintiffs' theory in this case has changed over the course of this litigation.

Along this same vein, because the court ultimately finds in favor of defendants on damages, defendants' argument that plaintiffs

With these considerations in mind, the court is not persuaded from the evidence at trial that the fair market value of HolliShare's JDS shares at the time of each prohibited transaction was anything more than the preceding December 31 book value. Moreover, even if the court were to assume that the fair market value of HolliShare's sales at the time of each prohibited transaction exceeded the December 31 book value, the court still finds that the sales at the December 31 book value did not cause harm to the Plan. The court is persuaded that the use of the December 31 book value did not have a detrimental effect on HolliShare when evaluated over an extended duration of time. As discussed in more detail below, four defendants and one expert credibly and consistently testified that, based on the dynamics of the HolliShare Plan, the closely held nature of JDS, and the fact that JDS retired shares it purchased, HolliShare's sale of its JDS stock at the December 31 book value did not cause a material loss to HolliShare.

As a threshold matter, the court agrees with defendants that any loss to the Plan must be assessed on a long-term basis, not isolated annual inquiries that ignore the dynamics of the Plan and various factors affecting its growth. When determining whether trustees' purchase of employer stock in an attempt to prevent a tender offer by another company caused a loss to a plan, the Second Circuit held that the appropriate measure of loss compared what the plan earned on the challenged investment and what it would have earned if the funds had been available for other purposes. *Donovan v. Bierwirth*, 754 F.2d 1049, 1056–57 (2d Cir.1985). In performing this inquiry, the Second Circuit explained that the comparisons of the respective investments must be considered over an extended period of time and not limited

to the date of the challenged transaction. *Id.* "*Donovan* thus stands squarely for the proposition that loss must be determined by examining the assets of the plan as a whole, not at an instant ..., but over a period of time." *Roth*, 61 F.3d at 604; *see also id.* at 602–03 (rejecting the district court's "snapshot" assessment of loss and explaining that it "failed to consider the time frame component of the loss calculation, and so doing implicitly focused upon too narrow a time frame").

Turning to the evidence presented at trial, Karlovsky first testified about the simulation he performed to determine whether the use of the December 31 book value had an impact on the Plan. Karlovsky has a Bachelor of Arts in systems engineering and a Master's degree in industrial engineering management, had previously worked as a strategic planning analyst, and had performed extensive research dealing with employee relations and compensation. (Tr. 336:1–337:25.) He explained:

> So when I joined the company and was evaluating the plan, I went back and used, for my own satisfaction, I went back and I used my mathematical modeling capabilities and my work experience in benefits to do some simulation and sensitivity analysis to see if it had a significant impact on the plan....
>
> [T]he plan has a plan design that's almost—first of all, it's very elegantly simple. You're taking the profits of the company and spreading it across the ownership shares. It's reciprocating, in that if you were to sell [ ] too many shares, for example, we would have cash left over at the end of the year. The price would be affected for the following year if we [sold] too much shares because the profits of the coming year

failed to timely disclose their surcharge theory or damages calculations is moot.

would be spread over fewer shares. So the price within the plan goes up for the next year.

And if we had [sold] too many shares, as we estimate the next year, we would have cash in the plan and we would have a higher price for it and we would be selling fewer shares-we would be asking to sell fewer shares the following year.

If you simulate that over time and you look at the decisions that may be affected by the associates as well because there's behavioral impact in the dynamics of the plan, you find that when you're looking at a retirement plan, that isn't a one year event. You're looking at someone working 15, 20, 25 years to receive a benefit.

The plan will moderate itself so that the individuals are receiving a just benefit over time, and materially it doesn't have a significant impact.... In my simulation that I had done, ... what would happen if we sold fewer shares in the middle of the year or the converse was what I did, I said we sold more shares, that would affect succeeding years in terms of the number of shares we would be buying back.

You can't just add them independently year after year. One year has an impact on the others. They reciprocate for each other because the price has gone up and we need fewer shares at a higher price the following year.

It's kind of a self-correcting model over time where one year makes an adjustment for the prior year, and the simulation process is what you would have to do. You cannot just do an additive of one year on top of the other on top of the other without involving the dynamics.

(Tr. 354:8–355:13, 361:1–14.) Karlovsky ultimately concluded that use of the December 31 book value did not cause a "material difference" to the Plan. (Tr. 357:15–16, 435:2–4, 438:1–8.)

McCormack, who has a Bachelor of Arts in social studies with a focus in economics and a Masters in Business Administration with an emphasis in finance, explained that, based on the closely held nature of JDS and the fact that JDS was not reissuing new shares, the financial effect of selling more shares one year (because the December 31 book value was used) evened out over time because there would be fewer outstanding shares the following year:

[I]n public companies we have a dilution of shareholder interest or a shareholder stock value, because in public companies, the shares are-you have an initial public offering and then you issue new shares, and that happens.

And then what happens, it dilutes the share ownership interest and the value of stock over time, everything else being equal.

At Hollister it was a very unique situation. We had the reverse dilution effect that we were always, as we have discussed, sir, retiring the shares over time. So therefore, the more shares that we sold, the more shares that we retired. You add the impact of earnings of the corporation plus the number of shares being reduced and you've got a higher value.

However, at Hollister, there was what we call the counterintuitive reverse dilution effect, and if I can attempt to explain that. The people in the plan would plan their account, would have a target, if you will, for the account balance they wanted to retire at. That retirement balance would be such that they would make a decision each year on whether or not they would leave, leave early or when they wanted to do.

On the other hand, if we sold the shares at June 30th [month-end book

value for a sale in June], we have to sell them at a higher price, and the consequence would be that they would receive a lesser benefit over time.

What we discovered through various analysis in discussion with my treasury department, that this counterintuitive effect based upon the number of shares outstanding—and this also took into consideration the direct share ownerships also—over time, this would balance out.

So I understand where you're coming from because you're coming from a public company knowledge. But the uniqueness of Hollister and the HolliShare plan and the direct ownership plan makes your conclusion [that selling at the December 31 book value harmed the plan], I think, erroneous.

(Tr. 768:9–769:20.)

Brilliant, who has a Bachelor of Arts in industrial management and a Masters in Business Administration from the Wharton Business School and had been a certified public accountant since 1975, (Tr. 1264:3–7, 1356:11–12), reached the same conclusion as McCormack, explaining:

By selling shares at the December 31st book value, as has been stated several times, versus the current book value, there are more shares that the plan is selling. At the end of the subsequent year, the next December 31st, there will be—by selling more shares back to the company, there will be less outstanding—there would be less outstanding common shares as of 12/31.

And when those outstanding shares are then divided into the shareholders' equity, which was unchanged because the dollar amount had already been subtracted under any share—at any share price or book value price, mathematically it would have the book value per share going up as of 12/31 because you'd have less shares in the denominator. So

all common shareholders, both direct and the plan, would have a higher book value than they would have otherwise had if they had sold—if they had sold less shares.

And the plan participation account, the account balances from year to year, the dollar amount of a participant's account balance is increased by the change in the value, the total value of the company. The predominant portion of that is the—of the change in the assets of the plan, and the predominant asset is the JDS—their ownership of the stock.

So if the book value increases 18 percent, and that same calculation at a different share value would have been 17 and a half percent, the participants, at the end of the following year, their individual account balance in that example would go up by 18 percent instead of going up by 17 percent.

(Tr. 1367:19–1368:22.)

Zwirner who has a Bachelor of Arts in economics and a Juris Doctorate, (Tr. 1982:20–23), echoed McCormack and Brilliant's conclusion:

[I]f you were to use the month end value, in the first year you would be selling back fewer shares, and at the end of that calendar year the plan would own more shares, which means it would own a larger percentage of the net equity of the company, which means the plan would be worth more and the account balances would be worth more.

What starts to happen in the second and subsequent years, however, is that when those—with those larger account balances, when people retire, the amounts required to pay out benefits are higher, which would then require HolliShare to sell back more shares than they do today, and that would have the oppo-

site effect of reducing their ownership interest.

Also, to the extent of the incremental cash required to pay the higher benefits, there would be a permanent reduction in the net equity of JDS Inc., which would again, at the end of the year, reduce the value of the company and the value, percentage value owned by the plan. (Tr. 2384:7–23.) Zwirner testified that it was his belief that, "over a period of time," the use of the December 31 book value instead of the month-end value had "no effect" on HolliShare. (Tr. 2385:24–25.)

Lastly, defendants' expert, Grabowski, performed an extensive analysis in which he examined the effect on the Plan if it was assumed that the fair market value of HolliShare's shares was two or three times the December 31 book value and HolliShare sold its shares at the increased price. He concluded that the benefits the participants received would have ultimately been the same regardless of whether the book value was used or a hypothetical fair market value of two or three times book value was used:

Q. Is it your understanding what really drives the incremental changes in the actual benefits and cash money that HolliShare participants walk out of the plan with, the principal driver is not what the values are, but what the incremental changes are from year to year in the values are?

A. Yes, it is. It took awhile for that sink in for me, but that's the driver of the value of the participants.

Q. Is this showing us that whether you value at book value and you do it consistently or value two times book value and do it consistently, if you assume that the rates of return on the shares is going to be the same percentage rates of return, you're going to generate the same dollars for the participants?

A. Yes.

Q. Let's to go the chart, the next page, paragraph three. Same analysis as the prior one except this one is at three times book?

A. Yes.

Q. You're, again, generating on the "dollars redeemed" line exactly the same amount of dollars?

A. Yes.

Q. This is saying if it's three times book at the beginning and three times book at the end, what the HolliShare participants are going to walk away with when they retire from this company is the same amount of dollars?

A. That's correct. On the previous page, going back to that, one of the things we did determine was the variability that actually occurred in the book value increases in HolliShare, in the JDS common stock was, in fact, a lot lower volatility than what the public shares of the guideline companies were. So its not just a matter of the average over a period of time, it's—the volatility is different and it's lower, so that those are two factors that need to be taken into account.

Q. If I can translate that into terms I think I can understand, is what you're telling us is you're going to come out with the same dollars, but you're going to have more stability using the book value than a market-based valuation method?

A. Yes. That's not based on theory, but based on looking at the guideline company, change in market values each year. They go up and down. There is a lot of volatility. The JDS stock book value has not had that kind of volatility.

(Tr. 2557:2–2558:20.) Grabowski further explained, "So there's a continuous change in how the value of the plan changes, but

it's really the incremental change. If book value goes up the same amount in percentage terms as market value goes up, the relative wealth at the end will be the same, the relative benefit to the participants." (Tr. 2555:14–18.)

■ All of these witnesses were well-educated and had training relevant to understanding the effect of using the December 31 book value for HolliShare's sales under all of the circumstances and dynamics relevant to HolliShare and JDS. Their consistent, credible, and unchallenged testimony was that the use of the December 31 book value did not cause long-term harm to the Plan. Based on their testimony and the evidence presented at trial, including the dynamics of the Plan and JDS, the court is persuaded that HolliShare's sale of JDS stock at the December 31 book value did not cause a material loss to HolliShare even if the December 31 book value was something less than the fair market value of the Plan's JDS shares at the time of each sale.

In *CIGNA Corp.,* the Supreme Court explained that "just as a court of equity would not surcharge a trustee for a nonexistent harm, a fiduciary can be surcharged under § 502(a)(3) only upon a showing of actual harm—proved (under the default rule for civil cases) by a preponderance of the evidence." *CIGNA Corp.,* 131 S.Ct. at 1881 (citation omitted); *accord Eaves,* 587 F.2d at 463 ("The law clearly permits approximations as to the extent of damage, *so long as the fact of damage or 'lost profits' is certain.*" (emphasis added)); *Brock,* 830 F.2d at 647 ("[M]onetarily pe-

nalizing an honest but imprudent trustee whose actions do not result in a loss to the fund will not further the primary purpose of ERISA."). Accordingly, because the court finds that the fiduciaries' breaches of their duties did not cause a material harm to the Plan, plaintiffs are not entitled to damages.

### 3. *Recovery of Excess Shares*

Consistent with the court's finding that the Trustees' sale of HolliShare's JDS shares at the December 31 book value did not cause a loss to the Plan over an extended period of time, the court is also convinced that use of the December 31 book value did not cause HolliShare to retain fewer shares than it would have if a higher price was used. As McCormack, Brilliant, and Zwirner testified, while use of a value lower than fair market value would have caused HolliShare to sell more shares to raise its cash requirements in the first year, when those shares were retired, it would decrease the number of outstanding shares and therefore increase the book value per share of the outstanding shares in the following year. As a result, HolliShare's remaining shares would have a higher value in subsequent years and HolliShare would need to sell fewer shares to meet its cash needs. Any loss in shares during the first year would therefore even out in subsequent years. The weight of the evidence therefore persuades the court that the use of the December 31 book value did not cause HolliShare to incur a material reduction in the number of JDS shares it owned.[41]

41. For purposes of discussion, the court refers to the "number of shares," but recognizes that comparing the number of shares from year to year is an oversimplification. Since JDS stock was issued, there has been at least two 100–for–1 stock splits and a 9–for–1 stock dividend. Even assuming the court found that the use of the December 31 book value caused loss to HolliShare, simply calculating the number of extra shares sold in a given year and requiring the Trustees to replace those shares would be misguided because it would ignore the fact that one share in 1992 is not the same as one share in 2012 because, during that time, two stock splits occurred and one dividend was declared.

Accordingly, because plaintiffs lack standing to seek prospective injunctive relief and the court finds that the fiduciary defendants' breaches of ERISA in failing to investigate the fair market value of HolliShare's JDS shares did not cause a loss to the Plan or plaintiffs, the court will enter judgment in favor of defendants on plaintiffs' claims under §§ 1104(a)(1), (a)(1)(B), and 1108(e).

## E. *Remaining Claims of Breach*

At trial, plaintiffs' claims based on HolliShare's sale of its JDS shares at the December 31 book value from the prior year revealed itself to be the heart of plaintiffs' case, and the damages and surcharge remedy plaintiffs seek is based entirely on those prohibited transactions. Plaintiffs have nonetheless alleged numerous other claims, which the court will briefly address.

First, plaintiffs allege that the Trustees breached their fiduciary duties and violated § 1104(a)(1)(D) by failing to follow the Plan's requirement to invest Plan assets in JDS shares to the maximum extent possible when they sold more shares of JDS stock than necessary to meet HolliShare's cash requirements in 1982, 1987, and 1993. Plaintiffs did not, however, propose or seek a remedy with respect to this claim. The evidence at trial also does not persuade the court that these sales were concealed from the beneficiaries, thus plaintiffs are unable to rely on the "fraud or concealment" exception in § 1113 and the claims are untimely.

Second, plaintiffs allege that the Trustees breached duties owed to HolliShare when they voted HolliShare's shares in favor of various amendments to the JDS Articles in 1978, 1980, 1984, and 1999. In the June 2009 Order, the court held that

the statute of limitations foreclosed all of plaintiffs' claims based on the votes in 1978, 1980, and 1984 and plaintiffs' direct claims against the fiduciaries based on the votes in 1999. *See DeFazio,* 636 F.Supp.2d at 1058–59. The court nonetheless held that plaintiffs' co-fiduciary liability claims under § 1105(a)(3) based on the votes in favor of the 1999 amendments were not time barred. As the court explained in the June 2009 Order, § 1105(a)(3) "makes a fiduciary liable for the breach of another fiduciary if 'he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach,'" and "[o]ne form of remedying the breaches of a co-fiduciary would be to file a suit against the breaching co-fiduciary to restore the losses to the plan or redress any violations of ERISA." *Id.* (quoting § 1105(a)(3)). The court therefore concluded in the June 2009 Order that, if "HolliShare fiduciaries had actual knowledge of the votes at the time they were cast and [ ] such votes constituted ERISA violations," the fiduciaries would have had three years to file suit and thus the claims were timely under § 1132(2). *Id.* at 1059.

■ The 1999 amendments prohibited natural persons from owning more than 10% of JDS stock, which plaintiffs contend eliminated a potential market for HolliShare to sell its common stock. The 1999 amendments also added a limited indemnity provision to the JDS Articles that indemnified directors from personal liability to shareholders for certain breaches. (*See* Ex. 535 at 5.) Even assuming these amendments constituted fiduciary breaches and thus give rise to § 1105(a)(3) claims

---

The testimony at trial was that, even though it is continually selling shares, HolliShare can infinitely extend its ownership of JDS stock through stock splits. (*See* Tr. 554:16–555:7.)

against the appropriate fiduciaries,[42] plaintiffs neither offered evidence that the amendments caused harm to the Plan or their individual accounts nor requested or proposed a remedy for any such harm. *See Silverman v. Mut. Ben. Life Ins. Co.,* 138 F.3d 98, 104 (2d Cir.1998) ("[Section 1109(a)] requires a plaintiff to demonstrate in a suit for compensatory damages that the plan's losses 'result[ed] from' [the fiduciary's] breach of § 1105(a)(3)." (second alteration in original)). Presumably, plaintiffs would suggest that their requested relief is included in their request that the court appointed trustee simply "correct the fiduciary breaches." Any such relief, however, would be prospective in nature, which the court has held plaintiffs lack standing to seek. *See DeFazio,* 636 F.Supp.2d at 1076–77. Accordingly, the court will enter judgment in favor of defendants on plaintiffs' § 1105(a)(3) claims relating to the 1999 amendments.

Third, based on the fact that many of the Trustees were individual shareholders and served on the JDS and Hollister Boards, plaintiffs allege that the fiduciaries breached various other duties and had numerous conflicts of interest. *See generally Pegram v. Herdrich,* 530 U.S. 211, 224, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) ("[T]he trustee under ERISA may wear different hats, ... [but ERISA requires that] the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions."); *Cunningham,* 716 F.2d at 1465 ("ERISA clearly provides that a fiduciary may be an officer or employee of the company whose securities he purchases on behalf of a plan." (citing 29 U.S.C. § 1108(c)(3))). For example, plaintiffs contend that, when HolliShare allegedly sold shares below the fair market value, the difference remained on the books of the company and was therefore spread equally amongst the remaining shares, including the individual shareholders. In doing so, plaintiffs contend that the Trustees breached their duty of loyalty

---

**42.** In holding that plaintiffs' § 1105(a)(3) claims relating to the 1999 amendments were timely, the court did not clarify which fiduciaries plaintiffs had viable § 1105(a)(3) claims against based on the 1999 amendments. Plaintiffs seem to suggest they are alleging the claim based on the limitation of ownership against Brilliant, Kelleher, and Zwirner and the claim based on the indemnity provision against Zwirner, McCormack, and Karlovsky. (*See* Pls.' Proposed Findings & Conclusions at 98:9–15.) Defendants appear to believe both claims are against only Brilliant and Kelleher. (*See* Defs.' Proposed Findings & Conclusions at 141–44.)

In discussing liability in the June 2009 Order, the court stated that plaintiffs had viable claims under § 1105(a)(3) only if the fiduciary had "knowledge of the votes at the time they were cast." *DeFazio,* 636 F.Supp.2d at 1059. Here, Brilliant did not become a trustee until 2000 and Kelleher did not become a trustee until 2004. Even assuming Brilliant and Kelleher had a duty to remedy a fiduciary breach that occurred before they were fiduciaries, *but see* 29 U.S.C. § 1109(b) ("No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary."), there was no testimony showing that they had knowledge that the votes in favor of the 1999 amendments violated ERISA. *See Cunningham,* 716 F.2d at 1475 ("Section 405 does not impose vicarious liability—it requires actual knowledge by the co-fiduciary .... '[T]he fiduciary must know the other person is a fiduciary with respect to the plan, must know that he participated in the act that constituted a breach, and must know that it was a breach.'" (quoting H.R.Rep. No. 1280, 1974 U.S.Code Cong. & Ad. News at 5083)).

It therefore appears that the proper defendants would have been Zwirner, McCormack, and Karlovsky, who were all trustees in 1999 at the time of HolliShare's vote in favor of the 1999 amendments. Nonetheless, the court's conclusion that plaintiffs failed to offer evidence of harm or seek a remedy with respect to their § 1105(a)(3) claims based on the 1999 amendments applies equally regardless of which defendants the claims are against.

under § 1104(a)(1)(A) and violated § 1106(b)(1), which prohibits a fiduciary from benefitting from any transaction that harms a plan. Plaintiffs base additional claims on the fiduciaries' alleged conflicts of interest and concealment of other potential markets for HolliShare's JDS shares.

The court has already determined that, in failing to perform a good faith investigation to determine the fair market value of the Plan's JDS shares, the fiduciaries breached their duties under §§ 1104(a)(1), (a)(1)(B), and 1108(e). This finding is sufficient to award plaintiffs the entirety of the relief they requested and have standing to seek. The court unequivocally informed plaintiffs at trial that it would only consider the relief plaintiffs requested, and plaintiffs have not sought any relief based on any alleged profit the fiduciaries gained from their breaches. The court will therefore enter judgment in favor of defendants on plaintiffs' claims relating to the fiduciaries' alleged conflicts and personal profits.

Lastly, in their amended statement purporting to identify all of their claims for trial, plaintiffs identified several claims that they declined to address at trial, in their post-trial briefing, or in their proposed findings of fact and conclusions of law. The court can only assume that plaintiffs have abandoned those claims, and in any event for the reasons discussed above plaintiffs are not entitled to any relief on those claims. The court will therefore enter judgment in favor of defendants on those claims. Specifically, the court will enter judgment in favor of defendants on the following abandoned claims: 1) plaintiffs' claim under § 1103 for defendants' alleged failure to hold Hol-

liShare assets in trust for the participants and beneficiaries; 2) plaintiffs' claim under § 1104(a)(1)(C) for defendants' alleged failure to diversify HolliShare's investments; and 3) plaintiffs' claim under § 1110(a), which declares void any plan provision that relieves ERISA fiduciaries from liability.[43]

During the course of trial, the court also ruled in favor of defendants on Defazio's and Ellis's claims under § 1056(d)(3) relating to payment of Defazio's benefits pursuant to the qualified domestic relations orders and Defazio's and Ellis's claims under § 1140 relating to defendants' filing of a motion in their divorce proceeding. (*See* Tr. 2171:3–2174:8, 2175:20–2176:8); *see generally DeFazio*, 636 F.Supp.2d at 1077–79.

### F. Attorneys' Fees

Both parties have requested an award of attorneys' fees in this action. Pursuant to 29 U.S.C. § 1132(g)(1), "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." The Supreme Court has recently held that "a fee claimant need not be a 'prevailing party' to be eligible for an attorney's fees award under § 1132(g)(1)." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. ——, ——, 130 S.Ct. 2149, 2156, 176 L.Ed.2d 998 (2010). Because Congress did not clearly indicate that it intended to abandon the American Rule, which provides for each litigant to pay his or her own fees, "a fees claimant must show 'some degree of success on the merits' before a court may award attorney's fees under § 1132(g)(1)." *Id.* at 2158 (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694, 103 S.Ct. 3274, 77 L.Ed.2d

---

**43.** The plaintiffs may have based their § 1110 claim on the indemnity provision added to the JDS Articles via the 1999 amendments, but their post-trial submissions do not reflect such an intent. Even if plaintiffs intended to attack the indemnity provision added via the 1999 amendments, the court's conclusion that the breach did not cause harm to plaintiffs would be the same.

938 (1983)). "A claimant does not satisfy that requirement by achieving 'trivial success on the merits' or a 'purely procedural victor[y],' but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a 'lengthy inquir[y] into the question whether a particular party's success was "substantial" or occurred on a "central issue." ' " *Id.* (quoting *Ruckelshaus,* 463 U.S. at 688 n. 9, 103 S.Ct. 3274).

After *Hardt,* the Ninth Circuit held that a district court "must consider the *Hummell* factors after they have determined that a litigant has achieved 'some degree of success on the merits.' " *Simonia v. Glendale Nissan/Infiniti Disability Plan,* 608 F.3d 1118, 1119 (9th Cir.2010); *see Hardt,* 130 S.Ct. at 2158 n. 8 ("We do not foreclose the possibility that once a claimant has satisfied this requirement, and thus becomes eligible for a fees award under § 1132(g)(1), a court may consider the five factors adopted by the Court of Appeals, in deciding whether to award attorney's fees."). The *Hummell* factors include:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

*Hummell v. S.E. Rykoff & Co.,* 634 F.2d 446, 453 (9th Cir.1980).

Here, the court found that the Trustees breached their duties under §§ 1104(a)(1), (a)(1)(B), and 1108(e) in failing to perform a good faith investigation to determine the fair market value of HolliShare's JDS stock and that the Hollister board members failed to adequately monitor the Trustees in this respect. In the abstract, this was a significant finding in favor of plaintiffs and an issue that the parties deeply disputed. The court ultimately concluded, however, that plaintiffs lacked standing to seek prospective injunctive relief and that the sales at the December 31 book value did not cause harm to HolliShare or plaintiffs' HolliShare accounts. This finding deflates the sails of any "victory" plaintiffs achieved in proving that defendants breached their fiduciary duties.

The outcome in this case is analogous to *Farrar v. Hobby,* 506 U.S. 103, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), in which the Supreme Court explained that a plaintiff who sought compensatory damages, but failed to prove "actual, compensable injury" and was awarded only nominal damages in the amount of $1.00 based on the violation of his procedural due process rights was not entitled to attorneys' fees. *Farrar,* 506 U.S. at 115, 113 S.Ct. 566. When evaluating the plaintiffs' "degree of success," the Court explained that plaintiffs "received nominal damages instead of the $17 million in compensatory damages that they sought," and thus the "litigation accomplished little beyond giving petitioners 'the moral satisfaction of knowing that a federal court concluded that [their] rights had been violated.' " *Id.* at 114, 113 S.Ct. 566 (*quoting Hewitt v. Helms,* 482 U.S. 755, 762, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987)) (alteration in original). The Court held, "[w]hen a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all." *Id.* at 115, 113 S.Ct. 566; *see also id.* at 116, 113 S.Ct. 566 ("If ever there was a plaintiff who deserved no attorney's fees at all, that plaintiff is Joseph Farrar. He filed a lawsuit demanding 17 million dollars from six defendants. After 10 years of litigation

and two trips to the Court of Appeals, he got one dollar from one defendant. As the Court holds today, that is simply not the type of victory that merits an award of attorney's fees.") (O'Connor, J., concurring).

Here, plaintiffs sought extraordinary damages, ranging from $30,674,599.56 to $244,382,485.00, but are not entitled to any award of damages. Plaintiffs' proof of defendants' breaches may give them some level of moral satisfaction, but their inability to prove any harm or obtain injunctive relief prevented them from achieving "some degree of success on the merits." Accordingly, the court finds that plaintiffs are not entitled to fees under § 1132(g)(1). *See Simonia*, 608 F.3d at 1121 ("Only after passing through the 'some degree of success on the merits' door is a claimant entitled to the district court's discretionary grant of fees under § 1132(g)(1).").

Defendants ultimately prevailed in this case and are entitled to seek fees under § 1132(g)(1); thus the court must determine whether to award defendants their attorneys' fees in light of the *Hummell* factors.

### (1) the degree of the opposing parties' culpability or bad faith;

Based on the court's conclusion that the fiduciary defendants breached their duties, the court finds that this factor weighs in favor of plaintiffs and merits against awarding defendants their attorneys' fees. Although harm did not result from the fiduciaries' breaches, it does not make their conduct acceptable. Defendants also argue that plaintiffs engaged in bad faith in pursuing this lawsuit and that plaintiffs' counsel's characterization of the defendants throughout this litigation amounted to bad faith. This case unquestionably did not proceed in an expeditious fashion, the theories of liability often appeared to be a moving target, and the growing animosity between counsel were palpable. The court finds, however, that both sides were responsible for the prolonged litigation and levied arguably personal attacks against their adversaries.

### (2) the ability of the opposing parties to satisfy an award of fees;

Although the court lacks evidence about each of the plaintiffs' ability to satisfy an award of fees, nothing in the record suggests that they have significant financial resources. With the exception of Ellis, even the balances of plaintiffs' HolliShare accounts were minimal when compared to the proceeds many of the defendants received from the sales of their JDS shares. For example, in order to keep his holding of JDS shares below ten percent, Winn sold $20 million in shares on one occasion, (Tr. 1858:14–15), and Herbert ultimately sold his shares for about $18 million, (Tr. 19823:9–12). Most significantly, Zwirner, who, as an attorney might be expected to help his fellow Trustees understand and comply with ERISA, was estimated to have JDS shares value in excess of $45 million, (Tr. 1925:2–6), and, when asked how much he had sold in the last six years to keep his holdings under ten percent, he answered that it was in the "range" of five to twenty million dollars. (Tr. 2017:2–18.) The court's impression at trial was that, even though defendants' fees will undoubtedly be significant, defendants are fully capable of paying them and plaintiffs are not. The burden of defendants' fees should not be shifted from the defendants, who breached their fiduciary duties and appear to have more than adequate resources to pay their attorneys, to the plaintiffs.

### (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances;

An award of fees may undoubtedly deter plaintiffs from pursuing such com-

plicated and contorted ERISA cases in the future. Given that the court found that the fiduciary defendants breached their duties under ERISA, however, the court cannot conclude that such cases should be entirely discouraged because there was at least some merit to plaintiffs' claims even if there was ultimately no harm. Similar to the Court's concern in *Farrar*, however, counsel might be more reluctant to pursue a case for almost a decade in the absence of clear loss to the Plan or a plaintiff that has standing to seek prospective injunctive relief. This factor therefore weighs in favor of defendants.

**(4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA;**

Here, plaintiffs sought relief in favor of the Plan, but clearly lacked standing to obtain an injunction affecting the future management of the Plan, and the evidence at trial convinced the court that the Plan did not suffer harm. It is unclear to the court why plaintiffs did not address these deficiencies early in the litigation. HolliShare was extremely successful and provided returns in excess of publicly traded stock and, to the extent that this action could have rendered HolliShare's primary investment worthless by bankrupting JDS or caused Hollister to think twice about continuing to offer the Plan to its employees,[44] the lawsuit would arguably be against the interests of current participants. The court therefore finds that this factor weights slightly in favor of defendants.

**(5) the relative merits of the parties' positions.**

Lastly, the court finds that the factor evaluating the relative merits of the parties does not weigh in favor of either party. As previously discussed, plaintiffs proved that defendants breached their fiduciary duties and, if any one of the plaintiffs had standing to seek injunctive relief, the court may have removed the Trustees from their positions. At the same time, however, defendants ultimately proved that their conduct did not cause harm to the Plan. At the end, this litigation resulted in more of a wash than a victory for either side.

When balancing the factors, the court concludes that the considerations weigh heavily in favor of denying defendants' fees under § 1132(g)(1). Although defendants prevailed in establishing that they did not cause harm to the Plan, they breached their duties and should not be able to shift the burden of their defense to plaintiffs. Accordingly, the court declines to award either side their attorneys' fees.

For the foregoing reasons, THE COURT HEREBY FINDS in favor of all defendants on all claims by all plaintiffs. Each side shall bear their own attorneys' fees.

The Clerk of the Court is instructed to enter judgment accordingly.

---

44. In enacting ERISA, "Congress sought 'to create a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place.' " *Conkright v. Frommert,* ── U.S. ──, ── 130 S.Ct. 1640, 1649, 176 L.Ed.2d 469 (2010) (quoting *Varity Corp. v. Howe,* 516 U.S. 489, 497, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996)) (alterations in original). This only one illustration suggesting that Congress may not succeeded in this aim.